Szaferman, Lakind,
 Blumstein & Blader, P.C.
101 Grovers Mill Road, Suite 200
Lawrenceville, N.J. 08648
(609) 275-0400

Levy, Konigsberg, LLP
101 Grovers Mill Road, Suite 200
Lawrenceville, N.J. 08648
(609) 720-0400

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ARTHUR HAMMELL and LINDA HAMMELL,<br><br>Plaintiffs,<br><br>v.<br><br>AIR & LIQUID SYSTEMS CORPORATION, et al.<br><br>Defendants | Hon. Mary L. Cooper, U.S.D.J.<br><br>DOCKET NO.: 3:14-cv-00013 (MLC)(TJB)<br><br>**Plaintiffs' L.Civ.R. 56.1 Statement of Undisputed Material Facts** |

In support of their Motion for Remand, or in the alternative for Partial

Motion Summary Judgement, Plaintiffs submit the following Statement of

Undisputed Material Facts pursuant to L.Civ.R. 56.1:

1075283.1                                    -1-

**Introduction**

1.     On November 15, 2013, Plaintiffs Arthur and Linda Hammell filed a Complaint in the Superior Court of New Jersey, Law Division, Middlesex County (MID-L-1933-12AS) against various Defendants, including Foster Wheeler Energy Corporation ("Foster Wheeler"), CBS Corporation f/k/a Westinghouse Electric Corporation ("Westinghouse"), and General Electric Company (General Electric).  (Declaration of Robert Lytle ("Lytle Dec.") at Ex. A).

2.     The case arises out of Mr. Hammell's diagnosis of mesothelioma, which Plaintiffs allege was caused by exposure to asbestos. (Lytle Dec., Ex. A at ¶2).

3.     Plaintiffs allege in their complaint that, while Mr. Hammell was enlisted in the United States Navy between 1962 and 1964, he was exposed to asbestos while aboard the U.S.S. Charles H. Roan, DD-853 ("USS Roan") as a result of work he performed on boilers manufactured by Foster Wheeler and turbines manufactured by both Westinghouse and General Electric.  (Ex. A, ¶3).

4.     Foster Wheeler admits that it manufactured boilers that were on the USS Roan. (Joint Foster Wheeler and Westinghouse Notice of Removal (collectively as "FWNOR") at ¶6).

5.     Westinghouse admits that it manufactured turbines that were on the USS Roan.  ("FWNOR") at ¶6).

6.     General Electric admits that it manufactured turbines that were on the USS Roan. (General Electric Notice of Removal ("GENOR") at ¶6).

7.     The only claim asserted by Plaintiffs against Foster Wheeler, Westinghouse, and General Electric is that they are strictly liable for failing to warn Mr. Hammell about the dangers of asbestos attributable to their equipment. (Lytle Dec., Ex. A at p. 13).

8.     Plaintiffs served Foster Wheeler, Westinghouse and General Electric with a copy of their Complaint on December 19, 2013.  (FWNOR, ¶2; GENOR, ¶2).

9.     On January 6, 2013, Foster Wheeler and Westinghouse filed a Notice of Removal with the United States District Court for the District of New Jersey. (FWNOR).

10.    On January 13, 2014, General Electric joined in the Notice of Removal filed by Foster Wheeler and Westinghouse. (GENOR).

11.    Foster Wheeler, Westinghouse, and General Electric have removed this case to Federal Court pursuant to the Federal Officer Removal Statute, 28 U.S.C. §1442(a)(1), based upon the assertion that, at the time they manufactured

the products at issue, they were "acting under an officer or agency of the United States" and "can state at least a colorable federal law-based 'government contractor' defense" to Plaintiffs' failure to warn claim. (FWNOR, ¶ 6; GENOR, ¶ 6).

12.     Thus, Foster Wheeler, Westinghouse and General Electric are asserting the government contractor defense as an affirmative defense in this matter. (*Id.*).

13.     Plaintiffs move to remand this case back to the Superior Court of New Jersey, or in the alternative for partial summary judgment, on the ground that the Affidavits supplied by Defendants do not provide an adequate factual foundation to support a colorable claim that they are immunized from liability based on their failure to provide warnings regarding the dangers of the asbestos in their products.

**Affidavit of Benjamin Lehman**

14.     In support of their government contractor defense, Foster Wheeler and Westinghouse rely on an Affidavit from Admiral (Ret.) Benjamin Lehman dated July 12, 2007. (FWNOR, Ex. M).

15.    In support of its government contractor defense, General Electric relies on a seperate Affidavit from Mr. Lehman dated October 6, 2004.  (GENOR, Ex. I).

16.    While Mr. Lehman spent most of his career working for military contractors, including General Electric, he worked in the U.S. Navy Shipyard Management and Contract Administration department between 1942 and 1944, as well as between 1950 and 1954.  (Lytle Dec., Ex. B at p. 9; GENOR, Ex. I at ¶1; FWNOR, Ex. M at ¶1).

17.    Mr. Lehman worked for Lockheed Missles and Space Co., from 1959 to 1969. (*Id.*).

18.    Mr. Lehman was not, therefore, enlisted in the Navy or working in the field of ship design or construction between 1962 and 1964 when Mr. Hammell was serving aboard the U.S.S. Charles H. Roan.  (*Id.*).

19.    Consequently, there is nothing in the record to demonstrate that Mr. Lehman has personal knowledge and experience regarding Navy specifications and practices between 1962 and 64.

20.    In his Affidavits, Mr. Lehman alleges in conclusory terms that the Navy exercised "complete control" over every piece of equipment it purchased

from military contractors, including "the decision of which warnings should or should not be included." (FWNOR, Ex. M at ¶10; GENOR, Ex. I at ¶4).

21.    However, Mr. Lehman has failed to supply the court with, or make reference to, a specific military specification or other documentation to support this claim. (*Ibid.*).

22.    In his Affidavits, Mr. Lehman again alleges in conclusory terms that the Navy "dictated every aspect of the . . . written documentation and warnings associated with its ships and did not permit any deviation from any of its contractors." (FWNOR, Ex. M at ¶11; GENOR, Ex. I at ¶5).

23.    However, Mr. Lehman has failed to supply the court with, or make reference to, a specific military specification or other documentation to support this claim. (*Ibid.*).

24.    Indeed, while the Navy did have the authority to review instructions and warnings provided by manufacturers, it very clearly assigned the responsibility to identify and develop warnings and instructions to the manufacturers of the equipment - and nowhere in Mr. Lehman's Affidavit does he cite any examples where the Navy actually rejected or modified warnings proposed by any manufacturer. (Affidavit of Arnold Moore ("Moore Aff."), ¶¶11-20, 24).

1075283.1                                      -6-

25.    In his Affidavit, Mr. Lehman also alleges, in equally conclusory terms, that "[t]he U.S. Navy made a conscious . . . decision about how asbestos would be used on its ships and how exposures would be controlled, if at all, on its ships" and that "[t]he U.S. Navy would not allow its equipment suppliers, such as Foster Wheeler, to affix any warning related to any asbestos hazards on their equipment." (FWNOR, Ex. M at ¶13-14).

26.    However, Mr. Lehman has failed to supply the court with, or make reference to, a specific military specification or other documentation to support these claims. (*Ibid.*).

27.    Mr. Lehman's Affidavits do not state or otherwise indicate that he has first-hand knowledge concerning any decision that the Navy may have made regarding warning its shipboard personnel about the dangers of asbestos, nor do they identify the source of any second-hand knowledge Mr. Lehman may have purportedly acquired about this subject. (GENOR, Ex. I; FWNOR, Ex. M).

28.    Nowhere in Mr. Lehman's Affidavits does he state or otherwise indicate that the Navy ever actually considered and rejected a warning recommended by Foster Wheeler, General Electric, Westinghouse, or any other manufacturer, concerning the dangers of asbestos contained in their equipment. (GENOR, Ex. I; FWNOR, Ex. M).

1075283.1                                    -7-

29.    Indeed, Mr. Lehman has testified in other similar litigations that he was unaware of any instance where the Navy prohibited a single government contractor from warning about the asbestos related dangers posed by their equipment. (Lytle Dec., Ex. C at 33:18 to 34:1).

30.    The relevant colloquy provides in that regard:

> Q: Do you have any knowledge, for any piece of equipment by any manufacturer at the time you were on active duty in the Navy, whether a manufacturer had suggested some sort of safety warning in the manuals that the Navy refused to allow in the manuals? Are you aware of that ever happening?
>
> A: Safety warnings in general? No, I am not aware that the Navy ever refused to permit a safety warning.

[*Ibid.*].

31.    Mr. Lehman further testified that he has no knowledge concerning whether the Navy would have permitted government contractors to provide warnings with their products and never sought such information. (Lytle Dec., Ex. C at 77:14 to 78:4).

32.    The relevant colloquy provides in that regard:

> Q. . . . When you were in the Navy, you never spoke to anybody about the subject of whether or

1075283.1

not the Navy would permit any warnings about asbestos and the hazards of breathing asbestos by an equipment manufacturer or anybody else, right?

A. When I was on active duty, that is correct.

Q. And you never read anything at any point in time as to whether or not the Navy would have allowed that?

A. That's correct.

Q. Is it fair to say that you don't know whether or not any equipment manufacturer, such as General Electric, ever even suggested putting a warning either on the outside of the turbine or in a manual about the hazards of breathing asbestos?

A. That is correct.

[*Ibid.*].

**Affidavit of J. Thomas Schroppe**

33.    In addition to the Lehmann Affidavits, Foster Wheeler and Westinghouse also rely on an Affidavit from J. Thomas Schrope dated March 10, 2006, in support of their government contractor defense. (FWNOR, Ex. L).

34.    Mr. Schroppe admits that he was employed by Foster Wheeler from 1962 until his retirement in 1999, and that he served as president of that company for part of that period.  (FWNOR, Ex. L, ¶1).

35. Mr. Schroppe's Affidavit alleges, in conclusory language similar to Mr. Lehman, that the technical manuals Foster Wheeler provided to the Navy with its boilers "included safety information related to the operation of naval boilers only to the extent directed by the Navy." (FWNOR, Ex. L at ¶21).

36. However, Mr. Schroppe has failed to supply the court with, or make reference to, a specific military specification or other documentation to support this claim. (*Ibid.*).

37. In his Affidavit, Mr. Schroppe also alleges in a conclusory manner that "Foster Wheeler would not be permitted, under the specifications, associated regulations and procedures, and especially under actual practice as it evolved in the field, to affix any type of warning or caution statement to a piece of equipment intended for installation onto a Navy vessel, beyond those required by the Navy." (FWNOR, Ex. L at ¶ 22).

38. However, Mr. Schroppe has failed to supply the court with, or make reference to, a specific military specification or other documentation to support this claim. (*Ibid.*).

39. While Mr. Schroppe claims that the Navy exercised intense direction and control over all written documentation supplied with the boiler (FWNOR, Ex. L at ¶¶21-22), he does not allege that the Navy exercised sole control over the

1075283.1 -10-

contents of the manuals supplied with Foster Wheeler boilers or that or that manufacturers such as Foster Wheeler were prohibited by the Navy from warning about the dangers from asbestos that the boilers posed to seamen. (FWNOR, Ex. L).

40.    In fact, Mr. Schroppe expressly testified at a deposition in a similar case that he was unaware of any instructions from the Navy which prohibited manufacturers from providing asbestos related warnings with their equipment. (Lytle Dec., Ex. D at 117:18 to 118:5).

41.    The relevant colloquy provides in that regard:

> Q: Mr. Schroppe, as you sit here now and look back at the 1960's, did you ever receive from any agent, representative, or personnel of the United States Navy or the U.S. Government an instruction that you or your company, Foster Wheeler, was not to put any warning of the asbestos contained on the Foster Wheeler boilers on the boilers or in any manuals?
>
> *    *    *
>
> A: The answer is no.
>
> [*Ibid.*].

**Affidavit of David Hobson**

1075283.1                                    -11-

42.    In addition to the Lehmann Affidavit, General Electric also relies on an Affidavit from David Hobson dated October 6, 2004, in support of its government contractor defense.  (GENOR, Ex. H).

43.    General Electric failed to include with its Notice of Removal a copy of Mr. Hobson's curriculum vitae or any other information concerning his qualifications to discuss the requirements the Navy imposed upon government contractors with respect to the warnings provided with their products.  (GENOR).

44.    Nevertheless, Mr. Hobson has testified at depositions in other similar litigations that he was employed by General Electric from 1969 through 1996 and that he has no experience or personal knowledge regarding Navy practices before 1969.  (Lytle Dec., Ex. E at 123:21-124:12).

45.    Since Plaintiffs' claims are based on his exposure to asbestos on the USS Roan from 1962 to 1964, Mr. Hobson has no personal knowledge of Navy specifications and practices before and during Mr. Hammell's service aboard the USS Roan.  (*Ibid.*).

46.    Moreover, Mr. Hobson's Affidavit does not identify a source of any purported second-hand knowledge of those specifications and practices.  (GENOR, Ex. H).

1075283.1                                                -12-

47. Therefore, all of the statements contained Mr. Hobson's Affidavit lack any evidential foundation. (GENOR, Ex. H).

48. Like Mssrs. Lehman and Schroppe, in his Affidavit Mr. Hobson alleges in conclusory terms that General Electirc would not have been permitted to furnish any type of warning or cautions regarding the health hazards posed by its turbines, unless expressly directed by the Navy. (GENOR, Ex. H at ¶5).

49. Putting aside Mr. Hobson's lack of personal knowledge on the subject, he too has failed to supply the court with, or make reference to, a specific military specification or other documentation to support this claim. (*Ibid.*).

50. Like Mssrs. Lehman and Schroppe, in his Affidavit Mr. Hobson also alleges in conclusory terms that "the Navy, not GE, determined the nature of hazards to be subject to any precautionary labeling and the content of the labeling . . . to be affixed to shipboard equipment and materials." (GENOR, Ex. H at ¶6).

51. Again, putting aside Mr. Hobson's lack of personal knowledge on the subject, he too has failed to supply the court with, or make reference to, a specific military specification or other documentation to support this claim. (*Ibid.*).

52. Furthermore, Mr. Hobson does not allege that General Electric ever proposed to the Navy that any warnings should be included on its turbines or in the accompanying written materials, including asbestos-related warnings. (*Ibid.*).

**Affidavit of Captain (Ret.) Arnold Moore**

53.    Plaintiffs' rely on the Affidavit of Captain (Ret.) Arnold Moore in support of their Motion for Remand, or in the alternative, Motion for Partial Summary Judgement.  (hereinafter "Moore Aff.").

54.    Based upon Mr. Moore's twenty-six years of experience as a Naval Officer, twenty-eight years of experience as a Naval architect and marine engineer directing the design of Naval warships, as well as his review of Navy specifications and standards from the 1930's through the 1960's, he has personal knowledge regarding the obligations that the Navy imposed upon its contractors in connection with the provision of warnings regarding the hazards associated with the equipment they manufactured and supplied to the Navy.  (Moore Aff., ¶10).

55.    Unlike Defendants' affiants, Mr. Moore's Affidavit includes specific references to, and attaches, relevant Navy specifications and other documents that support his assertions.  (*Ibid*).

56.    From the 1930s to the present time, manufacturers who provided equipment to the Navy were required by specifications to warn about any and all dangers that arose from the use of their equipment. There were no prohibitions in the specifications as to the content of the warnings that were to be provided by the manufacturers.  (Moore Aff., ¶¶12-34).

1075283.1                                    -14-

57.    As early as 1936, the Navy specified that manufacturers were required to provide written "safety precautions" with the equipment they were supplying. There were no prohibitions as to the content of the "safety precautions" that were to be provided by the manufacturers. (Moore Aff., ¶12, Ex. 2).

58.    In the 1950's, Navy specifications (MIL-B-15071A-C) required manufacturers to supply two manuals with their equipment "for placement onboard ship" that warned of "special hazards" associated with the use of the equipment. There were no prohibitions in the specifications as to the content of the "special hazards" that were to be addressed by the manufacturers.  (Moore Aff., ¶¶13-15, Ex.'s 4-6).

59.    In 1961, Navy specifications (MIL-M-15071D) provided that it was the Navy's "intent to accept the manufacturer's commercial type of manual or one prepared in accordance with his commercial practice whenever it is roughly equivalent to" Navy specifications, thereby demonstrating that the government's intent to accept commercial practices which are governed by state law.  (Moore Aff., ¶16, Ex. 7).

60.    In 1962, Navy specifications (MIL-M-15071E)  required manufacturers to provide manuals that contained "operating instructions" that contained "safety precautions." (Moore Aff., ¶17, Ex. 8).

61.    Military specification MIL-M-15071E further required that "cautions and warnings shall be used to emphasize important and critical instructions, consistent with the need" and further mandated the following:

> Notes, cautions, and warnings shall immediately precede the applicable instructions, and shall be selected in accordance with the following:
>     ***
>     (c) "WARNINGS" – Concerns an operating procedure or <u>practice</u> which, <u>if not strictly observed, will result in</u> injury to personnel or <u>loss of life</u>. (emphasis added) (Moore Aff., ¶17, Ex. 8 at p. 7).

There were no prohibitions in the specifications as to the content of the warnings that were to be provided by the manufacturers.

62.    The Navy Shipment Marking Handbook (the "Handbook"), dated 1942, governed shipping requirements for material provided to the Navy during construction of ROAN. " (Moore Aff., ¶18, Ex. 9).

63.    Paragraph 7 of the Handbook, which addressed warnings placed in packing materials, demonstrates the Navy's expectation that equipment manufacturers would be responsible for identifying and providing warnings concerning any hazards that may be encountered in the handling, storage or operation of their products.   (Moore Aff., ¶18).

64.    Paragraph 7 of the Handbook provides in that regard:

> 7. Method of marking inside containers - Inside packages come in containers, or unpacked items come and not immediately identifiable,

packed into an export container, shall be labeled or marked plainly . . . any necessary instructions for assembling of material **or warning as to handling, storage and operation** shall be packed with such material. (Moore Aff., ¶18, Ex. 9 at p. 06282.) (emphasis added.)

65.    Paragraph 8(a)(14) of the Handbook, which explicitly required warnings for hazardous materials and fully acknowledged that other regulations, such as state laws, must be followed similarly states:

> 8. Outside markings - (a) the following markings shall appear on the outside face of each package in accordance with accompanying illustrations...(14) special markings such as Top, Glass, Acid, Explosives, Keep Dry, Handle With Care, Fragile, Delicate Instruments, and such other markings and special handling instructions **or warnings** as may be required by the Interstate Commerce Commission **or other regulations.** (Moore Aff., ¶18, Ex. 9 at p. 06282, 06284) (emphasis added.)

66.    Paragraph 10(e) of the Handbook addressed the need for warnings when hazards, such as asbestos containing materials, might be expected in the assembly of products:

> 10. Shipping papers to accompany shipment - ...(e) Special assembly instructions or warnings - when such instructions are necessary, shipping activities shall see that they accompany the shipment and that they are conspicuously indicated. (Moore Aff., ¶18, Ex. 9 at p. 06286.)

67.    The Navy adopted a "Uniform Labeling Program" in 1956, which required the labeling of any "toxic" substances that "may give off a harmful vapor, dust, fume or mist during handling or operations." (Moore Aff, ¶ 19).

1075283.1                          -17-

68.    The document establishing this program stated that the "mode of entry into the body" from a "toxic hazard" could include "inhalation" and that its "injurious effect" could "arise from . . . repeated exposures over a prolonged period (chronic)." (Moore Aff, ¶19, Ex. 10 at p. 1).

69.    This document also stated that its warning requirements were applicable to "all hazardous materials throughout the Naval Establishment wherever distribution of hazardous chemicals and materials is made to the actual consumer (ship, office or unit)[,]", which would include asbestos-containing material delivered to a shipyard for installation aboard a Navy ship.  (Moore Aff, ¶19, Ex. 10 at p. 1).

70.    A similar document adopted by the Navy, entitled Warning Labels, Manufacturing Chemists Association, states that there is a need for information covering hazardous materials to reach every person using those materials and that the most practical means for the seller of a hazardous product to disseminate this information is through labels. (Moore Aff., ¶20 at Ex. 11).

71.    Foster Wheeler's own Drawings demonstrate that the Navy did not prohibit manufacturers from affixing warnings to their equipment when manufacturers deemed them necessary.  (Moore Aff., ¶21, Ex. 12).

72.   An Instruction Book for the Operation and Maintenance of Foster Wheeler Marine Steam Generators Installed in US Navy Destroyers, which is specifically applicable to the USS Roan, illustrates that Foster Wheeler was fully aware of Navy requirements for the inclusion of safety precautions in instruction manuals and included those safety precautions that it deemed important.  (Moore Aff., ¶22, Ex. 12).

73.   Similarly, the Seventh (1944) editions of the Foster Wheeler Instruction Book for Marine Steam Generators, which applied to commercial marine boilers, contained cautionary language applicable to personnel safety, which demonstrates that the company was cognizant of the need to disseminate those warnings and safety precautions that it considered important to all of its customers. (Moore Aff., ¶23, Ex. 14).

SZAFERMAN, LAKIND,
BLUMSTEIN & BLADER, P.C.

Robert E. Lytle