Szaferman, Lakind, Blumstein,
& Blader, P.C.
101 Grovers Mill Road, Suite 104
Lawrenceville, N.J. 08648
(609) 275-0400

Levy Konigsberg, LLP
101 Grovers Mill Road, Suite 105
Lawrenceville, N.J. 08648
(609) 720-0400

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ARTHUR HAMMELL and LINDA HAMMELL,<br><br>Plaintiffs,<br><br>v.<br><br>AIR & LIQUID SYSTEMS CORPORATION, et al.,<br><br>Defendants. | Hon. Mary L. Cooper<br><br>Civil No. 3:14-cv-00013 MLC TJB<br><br>**DECLARATION OF ROBERT E. LYTLE** |

Pursuant to the provisions of 28 U.S.C. §1746, I, Robert Lytle, hereby declare and state the following:

1.    On November 15, 2013, Plaintiffs Arthur and Linda Hammell filed a Complaint in the Superior Court of New Jersey, Law Division, Middlesex County (MID-L-1933-12AS) against various Defendants, including Foster Wheeler

1070527.1                                         1

Energy Corporation ("Foster Wheeler"), CBS Corporation f/k/a Westinghouse Electric Corporation ("Westinghouse"), and General Electric Company (General Electric). (Declaration of Robert Lytle ("Lytle Dec.") at Ex. A).

2.   The case arises out of Mr. Hammell's diagnosis of mesothelioma, which Plaintiffs allege was caused by exposure to asbestos. (Lytle Dec., Ex. A at ¶2).

3.   Plaintiffs allege in their complaint that, while Mr. Hammell was enlisted in the United States Navy between 1962 and 1964, he was exposed to asbestos while aboard the U.S.S. Charles H. Roan, DD-853 ("USS Roan") as a result of work he performed on boilers manufactured by Foster Wheeler and turbines manufactured by both Westinghouse and General Electric. (Ex. A, ¶3).

4.   Foster Wheeler admits that it manufactured boilers that were on the USS Roan. (Joint Foster Wheeler and Westinghouse Notice of Removal (collectively as "FWNOR") at ¶6).

5.   Westinghouse admits that it manufactured turbines that were on the USS Roan. ("FWNOR") at ¶6).

6.   General Electric admits that it manufactured turbines that were on the USS Roan. (General Electric Notice of Removal ("GENOR") at ¶6).

7.     The only claim asserted by Plaintiffs against Foster Wheeler, Westinghouse, and General Electric is that they are strictly liable for failing to warn Mr. Hammell about the dangers of asbestos attributable to their equipment. (Lytle Dec., Ex. A at p. 13).

8.     Plaintiffs served Foster Wheeler, Westinghouse and General Electric with a copy of their Complaint on December 19, 2013.  (FWNOR, ¶2; GENOR, ¶2).

9.     On January 6, 2013, Foster Wheeler and Westinghouse filed a Notice of Removal with the United States District Court for the District of New Jersey. (FWNOR).

10.     On January 13, 2014, General Electric joined in the Notice of Removal filed by Foster Wheeler and Westinghouse. (GENOR).

11.     Foster Wheeler, Westinghouse, and General Electric have removed this case to Federal Court pursuant to the Federal Officer Removal Statute, 28 U.S.C. §1442(a)(1), based upon the assertion that, at the time they manufactured the products at issue, they were "acting under an officer or agency of the United States" and "can state at least a colorable federal law-based 'government contractor' defense" to Plaintiffs' failure to warn claim.  (FWNOR, ¶ 6; GENOR, ¶ 6).

12.    Thus, Foster Wheeler, Westinghouse and General Electric are asserting the government contractor defense as an affirmative defense in this matter.  (*Id.*).

13.    Plaintiffs move to remand this case back to the Superior Court of New Jersey, or in the alternative for partial summary judgment, on the ground that the Affidavits supplied by Defendants do not provide an adequate factual foundation to support a colorable claim that they are immunized from liability based on their failure to provide warnings regarding the dangers of the asbestos in their products.

14.    Attached as Exhibit A is a true and correct copy of the complaint filed by Plaintiffs in the Superior Court of New Jersey, Middlesex County.

15.    Attached as Exhibit B is a true and correct copy of the Affidavit of Admiral (Ret.) Ben J. Lehman dated July 12, 2007, along with his Curriculum Vitae.

16.    Attached as Exhibit C is a true and correct copy of selected pages from the deposition transcript of Ben Lehman dated March 21, 2005, in the matter of *Robert Nesbiet v. General Electric Company, et al.*, Case No. 04-CV-9321 (SAS)(S.D.N.Y.).

17.    Attached as Exhibit D is a true and correct copy of selected pages from the deposition transcript of J. Thomas Schroppe dated October 28, 2005, in the matter of *Barbara Davis, et al. v. Asbestos Defendants (BHC), et al.*, Case No. 303804, Superior Court of the State of California, County fo San Francisco.

18.    Attached as Exhibit E is a true and correct copy of selected pages from the deposition transcript of David Hobson dated May 20, 2004, in the matter of *In re: New York City Asbestos Litigation*, Supreme Court of the State of new York, County of New York.  Case No. 04-CV-9321 (SAS)(S.D.N.Y.).

19.    Attached hereto as Exhibit F is a true and correct copy of the opinion of the United States Court for the Southern District of Illinois, in the matter of *Baker v. Air & Liquid Systems Corporation*, Civil No. 11-8-GPM, 2011 WL 499963 (S.D.Ill. Feb. 7, 2011).

20.    Attached hereto as Exhibit G is a true and correct copy of the opinion of the United States District Court for the Eastern District of Louisiana in the matter of *Cardaro v. Aerojet General Corporation*, Civil No. 05-2684, 2010 WL 3488207 (E.D.La. Aug. 27, 2010).

21.    Attached hereto as Exhibit H is a true and correct copy of the opinion of the United States District Court for the Northern District of California in the

matter of *Lindenmayer v. Allied Packing & Supply Inc.*, Civil No. C09-05800 TEH, 2010 WL 234906, (N.D.Ca. Jan. 14, 2010).

22.   Attached hereto as Exhibit I is a true and correct copy of the opinion of the United States District Court for the Western District of Washington in the matter of *Prewett v. Goulds Pumps (IPG)*, Civil No. C09-0838 RSM, 2009 WL 295877 (W.D.Wash. Sept. 9, 2009).

23.   Attached hereto as Exhibit J is a true and correct copy of the opinion of the United States District Court for the Western District of Washington in the matter of *Westmiller v. IMO Industries, Inc.*, No. 05-945 RSM, 2005 WL 2850334 (W.D.Wash. Oct. 20, 2005).

24.   Attached hereto as Exhibit K is a true and correct copy of the Order Granting Motion to Remand of the United States District Court for the Western District of Washington in the matter of *McMann v. Air & Liquid Systems Corp.*, Case No. C13-5721 BHS, Document 55, (W.D. Wash. Oct. 22, 2013).

25.   Attached hereto as Exhibit L is a true and correct copy of the opinion of the United States District Court for the Central District of California in the matter of *Early v. Northrop Grumman Corp.*, No. 2:13-cv-3130-ODW (MRWx), 2013 WL 3872218 (C.D.Cal. July 24, 2013).

26.  Attached hereto as Exhibit M is a true and correct copy of the opinion of the United States District Court for the Southern District of New York in the matter of *Susan Cuomo, et al. v. Air & Liquid Systems Corp., et al.*, No. 13-cv-273(SAS), 2013 WL 5913379 (S.D.N.Y. Nov. 1, 2013).

SZAFERMAN, LAKIND,
BLUMSTEIN & BLADER, PC
Attorneys for the Plaintiffs

BY: _____
ROBERT E. LYTLE

Dated: March 17, 2014

1070527.1                              7

# Exhibit A

SZAFERMAN, LAKIND,
    BLUMSTEIN & BLADER, P.C.
101 Grovers Mill Road, Suite 200
Lawrenceville, N.J. 08648
(609) 275-0400

LEVY PHILLIPS & KONIGSBERG, LLP
101 Grovers Mill Road, Suite 200
Lawrenceville, N.J. 08648
(609) 720-0400

Attorneys for Plaintiffs
Attorney ID No. 046331990

SUPERIOR COURT
MIDDLESEX COUNTY
RECEIVED & FILED

NOV 15 2013

GREGORY EDWARDS
DEPUTY CLERK
OF SUPERIOR COURT

| | |
|---|---|
| ARTHUR HAMMELL and LINDA HAMMELL,<br><br>                  Plaintiffs,<br><br>        v.<br><br>AIR & LIQUID SYSTEMS CORPORATION as successor by merger to Buffalo Pump, Inc.; ARVINMERITOR, INC., f/k/a Arvin Industries, Inc., individually and as successor by merger to Rockwell International; BORG WARNER MORSE TEC, f/k/a Borg Warner; CALIFORNIA SPEED AND SPORT SHOP; CAMERON INTERNATIONAL CORPORATION, individually and as successor-in-interest to Joy Manufacturing Company, a/k/a Joy Compressors; CARRIER CORPORATION; CBS CORPORATION, a Delaware Corporation, f/k/a, Viacom, Inc., successor by merger to CBS Corporation, a Pennsylvania Corporation, f/k/a Westinghouse Electric Corporation; CERTAINTEED CORPORATION, individually and as successor to Keasbey & Mattison Co.; CLARK RELIANCE CORP., individually and as successor-in-interest to Jerguson Gage & Valve Company; | SUPERIOR COURT OF NEW JERSEY LAW DIVISION, MIDDLESEX COUNTY<br><br>DOCKET NO.: MID-L-       -13AS<br><br><br>MID-L- 0 0 7 2 9 6 - 1 3 AS<br><br>Civil Action – Asbestos Litigation<br><br><br><br><br><br>COMPLAINT, JURY DEMAND, DEMAND FOR ANSWERS TO STANDARD INTERROGATORIES AND DESIGNATION OF TRIAL COUNSEL |

919474.1

CRANE CO., successor to Jenkins Valves, Inc., a/k/a Jenkins Bros.; EATON CORPORATION, as successor in interest to Cutler-Hammer, Inc., n/k/a Eaton Electrical, Inc.; FORD MOTOR COMPANY; FOSTER WHEELER ENERGY CORP.; FMC CORPORATION; GENERAL CABLE CORPORATION; GENERAL ELECTRIC COMPANY; GENLYTE GROUP, INC., as successor to Lightolier, Inc.; GEORGIA-PACIFIC, LLC; HONEYWELL INTERNATIONAL, INC., f/k/a Allied Signal, Inc. As successor-in-interest to The Bendix Corporation; IMO INDUSTRIES, INC., successor to and f/k/a Delaval Turbine, Transamerica Delaval and IMO Delaval; INTERNATIONAL TRUCK AND ENGINE CORPORATION, f/k/a Navistar International Transportation Corporation, and p/t/k/a International Harvester Company; JOHN CRANE, INC., a/k/a Crane Packing Company; MAREMONT CORPORATION, individually and as successor to Grizzly; NATIONAL AUTOMOTIVE PARTS ASSOCIATION a/k/a Genuine Parts Co.; NAVISTAR INTERNATIONAL TRANSPORTATION CORPORATION; PEP BOYS-MANNY MOE & JACK OF DELAWARE, INC.; PNEUMO-ABEX, LLC, as successor-in-interest to Abex Corporation, f/k/a American Brake Shoe Company; PROGRESS LIGHTING, INC.; ROCKWELL AUTOMATION, INC., as successor by merger to Allen-Bradley, Inc.; STANDARD MOTOR PRODUCTS, INC., a/k/a EIS BRAKE PARTS; SQUARE-D CO.; TODD SHIPYARDS CORP., individually and for its Todd Combustion Division; TRANE US, INC., f/k/a American

919474.1

2

Standard, Inc., successor-in-interest to Kewanee Boiler Corp.; UNION CARBIDE CORP.; WARREN PUMPS, individually and as successor to The Qumiby Pump Company; John Doe Corporations 1-50; and John Doe Corporations 51-75,

Defendants.

Plaintiffs, Arthur Hammell and Linda Hammell, by way of complaint against the Defendants, allege and say:

## PARTIES – PLAINTIFFS

1. Plaintiffs, Arthur Hammell and Linda Hammell, are husband and wife residing at 6404 South Newport Court, Centennial, Colorado 80111. Plaintiffs worked and resided in New Jersey up through 1984.

2. The Plaintiff, Arthur Hammell ("Plaintiff" or "Mr. Hammell"), was diagnosed with mesothelioma in approximately July 2013, caused by exposure to Defendants' asbestos products.

3. Mr. Hammell was exposed to asbestos while serving in the United States Navy on board the U.S.S. Roan (DD-853) as a boilerman from approximately April 5, 1962 through September 18, 1964. These asbestos exposures occurred on board the U.S.S. Roan both while the ship was at sea and while docked at various shipyards including the Brooklyn Navy Yard in Brooklyn, New York. Mr. Hammell regularly worked on and maintained all of the asbestos-containing equipment located in the boiler room of the

919474.1

3

ship, which required the handling of asbestos-containing materials including gaskets, packing, cloth, cement and insulation which created visible and respirable dust.

4. Prior to serving on the U.S.S. Roan, Mr. Hammell was exposed to asbestos in New Jersey while working as an electrician's helper at the Raritan Arsenal from September 1961 to April 1962 during which time he handled various electrical products that contained asbestos, including wire, cable and lighting fixtures.

5. Mr. Hammell was further exposed to asbestos while assisting his father in construction activities in New Jersey from approximately 1953 up through approximately 1960.

6. Mr. Hammell was further exposed to asbestos as a bystander to automotive repairs at a Sunoco service station in or around Edison, New Jersey in the late 1950s and early 1960s.

7. Mr. Hammell was further exposed to asbestos in New Jersey while performing automotive repair work, including with brakes and clutches, on his personal vehicles and those of his friends and family from approximately 1959 up through the 1970s.

8. Mr. Hammell was further exposed to asbestos in New Jersey as a bystander to the repair of trucks, including brake and clutches, while working at United Parcel Service in New Jersey from approximately 1964 up through the 1970s.

9. As a direct and proximate result of the above exposures, Plaintiff, Arthur Hammell, inhaled and ingested

919474.1                          4

asbestos containing dust particles and fibers from Defendants' products, from which he developed mesothelioma and has suffered and continues to suffer from other various diverse injuries and attendant complications.

## PARTIES - DEFENDANTS

10. Defendants, AIR & LIQUID SYSTEMS CORPORATION as successor by merger to Buffalo Pump, Inc.; ARVINMERITOR, INC., f/k/a Arvin Industries, Inc.; BORG WARNER MORSE TEC, f/k/a Borg Warner; CALIFORNIA SPEED AND SPORT SHOP; CARRIER CORPORATION; CBS CORPORATION, a Delaware Corporation, f/k/a, Viacom, Inc., successor by merger to CBS Corporation, a Pennsylvania Corporation, f/k/a Westinghouse Electric Corporation; CERTAINTEED CORPORATION, individually and as successor to Keasbey & Mattison Co.; CRANE CO., successor to Jenkins Valves, Inc., a/k/a Jenkins Bros.; EATON CORPORATION, as successor in interest to Cutler-Hammer, Inc., n/k/a Eaton Electrical, Inc.; FORD MOTOR COMPANY; FOSTER WHEELER ENERGY CORP.; FMC CORPORATION; GENERAL CABLE CORPORATION; GENERAL ELECTRIC COMPANY; GENLYTE GROUP, INC., as successor to Lightolier, Inc.; GEORGIA-PACIFIC, LLC; HONEYWELL INTERNATIONAL, INC., f/k/a Allied Signal, Inc. As successor-in-interest to The Bendix Corporation; IMO INDUSTRIES, INC., successor to and f/k/a Delaval Turbine, Transamerica Delaval and IMO Delaval; JOHN CRANE, INC., a/k/a Crane Packing Company; MAREMONT CORPORATION, individually and as successor to Grizzly; NATIONAL AUTOMOTIVE PARTS ASSOCIATION; NAVISTAR INTERNATIONAL

919474.1

TRANSPORTATION CORPORATION; PEP BOYS-MANNY MOE & JACK OF DELAWARE, INC.; PNEUMO-ABEX, LLC, as successor-in-interest to Abex Corporation, f/k/a American Brake Shoe Company; PROGRESS LIGHTING, INC.; ROCKWELL AUTOMATION, INC., as successor by merger to Allen-Bradley, Inc.; STANDARD MOTOR PRODUCTS, INC., a/k/a EIS BRAKE PARTS; SQUARE-D CO.; TODD SHIPYARDS CORP., individually and for its Todd Combustion Division; TRANE US, INC., f/k/a American Standard, Inc., successor-in-interest to Kewanee Boiler Corp.; UNION CARBIDE CORP.; WARREN PUMPS, individually and as successor to The Qumiby Pump Company were manufacturers, suppliers or distributors of asbestos fibers, dust, minerals, particles and other finished and unfinished asbestos products that Plaintiff used or to which he was exposed.

11.  John Doe Corporations 1 through 50 are the fictitious names of corporations, partnerships, and/or other business entities whose identities are not presently known, and who mined, manufactured, sold, marketed, installed and/or removed asbestos or asbestos-containing products that Plaintiff used or to which he was exposed.

12.  John Doe Corporations 51 through 75 are the fictitious names of corporations, partnerships, and/or other business entities whose identities are not presently known, and who are the alter egos of or are otherwise responsible for the conduct or liability of those who mined, milled, manufactured, sold, marketed, installed and/or removed asbestos, or asbestos-

919474.1                                             6

containing products, that Plaintiff used or to which was exposed.

## FIRST COUNT

13. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 12 as though hereinafter set forth at length.

14. The Defendants conduct and/or have conducted business in New Jersey at all times relevant herein.

15. The Defendants breached their warranties, both express and implied, for fitness of purpose and merchantability.

16. The Defendants are strictly liable in tort.

17. As a direct and proximate result of the above exposures, Plaintiff, Arthur Hammell, contracted mesothelioma and has suffered, and continues to suffer, from other various diverse injuries and attendant complications.

18. It was foreseeable to the Defendants that Plaintiff, Arthur Hammell, and others similarly situated, would be injured as a result of their actions, inactions and misconduct.

**WHEREFORE**, Plaintiffs demand judgment against the Defendants, jointly and severally for:

a) Compensatory damages;

b) Punitive damages;

c) Pre-judgment and post judgment interest;

d) Costs;

e) Attorney fees and litigation expenses; and

f) Such other relief as the Court may deem just and proper.

919474.1                                                      7

## SECOND COUNT

19.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 18 as though hereinafter set forth at length.

20.    The Defendants, jointly and severally marketed an ultra-hazardous product and placed that product in the stream of commerce.

21.    As a direct and proximate result of the above exposures, Plaintiff, Arthur Hammell, contracted mesothelioma and has suffered, and continues to suffer, from other various diverse injuries and attendant complications.

**WHEREFORE**, Plaintiffs demand judgment against the Defendants, jointly and severally for:

   a) Compensatory damages;

   b) Punitive damages;

   c) Pre-judgment and post judgment interest;

   d) Costs;

   e) Attorney fees and litigation expenses; and

   f) Such other relief as the Court may deem just and proper.

## THIRD COUNT

22.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 21 as though hereinafter set forth at length.

23.    Defendants breached their non-delegable duty to warn and negligently supplied defective materials and products without

919474.1                                    8

ensuring that Plaintiff, Arthur Hammell, and his employers were warned about the dangers of asbestos exposure.

24. Defendants' actions prevented Plaintiff's employers from educating Plaintiff, Arthur Hammell, and their other employees, on the dangers of asbestos exposure and from taking action to minimize the risks of exposure in and out of the workplace.

25. As a direct and proximate result of the above exposures, Plaintiff, Arthur Hammell, contracted mesothelioma and has suffered, and continues to suffer, from other various diverse injuries and attendant complications.

**WHEREFORE**, Plaintiffs demand judgment against the Defendants, jointly and severally for:

a) Compensatory damages;

b) Punitive damages;

c) Pre-judgment and post judgment interest;

d) Costs;

e) Attorney fees and litigation expenses; and

f) Such other relief as the Court may deem just and proper.

**FOURTH COUNT**

26. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 25 as though hereinafter set forth at length.

27. Defendants willfully, wantonly and intentionally conspired, and acted in concert, to withhold information from

919474.1                                     9

Plaintiff, Arthur Hammell, Plaintiff's employers and the general public concerning the known hazards associated with the use of, and exposure to, asbestos products.

28. Defendants willfully, wantonly and intentionally conspired, and acted in concert, to withhold information from Plaintiff, Arthur Hammell, Plaintiff's employers and the public relating to the fact that asbestos fiber inhalation could be fatal.

29. Defendants willfully, wantonly and intentionally conspired, and acted in concert, to disseminate false product safety information to Plaintiff, Arthur Hammell, Plaintiff's employers and the public.

30. Defendants willfully, wantonly and intentionally conspired, and acted in concert, to prevent the dissemination of information concerning their products' hazards and dangers.

31. Defendants willfully, wantonly and intentionally failed to take appropriate action to minimize the risks of asbestos exposure to Plaintiff and the general public.

32. As a direct and proximate result of the above exposures, Plaintiff, Arthur Hammell, contracted mesothelioma and has suffered, and continues to suffer, from other various diverse injuries and attendant complications.

**WHEREFORE**, Plaintiffs demand judgment against the Defendants, jointly and severally for:

a) Compensatory damages;

919474.1

10

b) Punitive damages;

c) Pre-judgment and post judgment interest;

d) Costs;

e) Attorney fees and litigation expenses; and

f) Such other relief as the Court may deem just and proper.

## FIFTH COUNT

33. Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 32 as though hereinafter set forth at length.

34. The Defendants aforesaid were willful, by intentionally withholding form the Plaintiff, Arthur Hammell, the known dangers associated with the use of asbestos compounds, bystander exposure, and intentionally withholding from the Plaintiff, Arthur Hammell, knowledge that breathing in respirable asbestos fiber dust generated from asbestos-containing products can be fatal. Defendants issued information, which they knew to be false concerning the products' hazards and dangers, and willfully, wantonly and intentionally failed to take the appropriate steps to minimize the risks of asbestos exposure, and otherwise acted wilfully, wantonly and intentionally with reference to their products.

35. As a direct and proximate result of the above exposures, Plaintiff, Arthur Hammell, contracted mesothelioma and has suffered, and continues to suffer, from other various diverse injuries and attendant complications.

919474.1                                      11

**WHEREFORE**, Plaintiffs demand judgment against the Defendants, jointly and severally for:

a) Compensatory damages;

b) Punitive damages;

c) Pre-judgment and post judgment interest;

d) Costs;

e) Attorney fees and litigation expenses; and

f) Such other relief as the Court may deem just and proper.

<u>SIXTH COUNT</u>

36. Plaintiffs repeat and reallege every allegation contained in paragraphs 1 through 35 as though hereinafter set forth at length.

37. Plaintiff, Linda Hammell, is the wife of Arthur Hammell.

38. Due to the actions of the Defendants, the Plaintiff, Linda Hammell, has been wrongfully deprived of her husband's society, services and consortium.

**WHEREFORE**, Plaintiffs demand judgment against the Defendants, jointly and severally for:

a) Compensatory damages;

b) Punitive damages;

c) Pre-judgment and post judgment interest;

d) Costs;

e) Attorney fees and litigation expenses; and

f) Such other relief as the Court may deem just and proper.

919474.1

12

Plaintiffs hereby incorporate by reference all allegations set forth in the Standard Complaint, as amended, which is contained in the Asbestos Manual. A copy of the Asbestos Manual which contains the Standard Complaint can be obtained from the Middlesex County Mass Tort Clerk or by visiting the following website:

http://www.judiciary.state.nj.us/mass-tort/asbestos/asbestos_amended_std_complaint.pdf

### DISCLAIMER OF FEDERAL JURISDICTION

Plaintiffs specifically disclaim any federal cause of action or any claim that would give rise to federal jurisdiction. To the extent that any of the Plaintiff's asbestos exposure took place on a federal enclave, or to the extent that any of the Plaintiff's asbestos exposure occurred on board vessels of the United States military (including Naval ships), or in the construction, maintenance and/or repair of United States military vessels and/or aircraft, Plaintiffs' negligence claim against manufacturers, sellers and suppliers of asbestos-containing products installed on such vessels and/or aircraft are not based on the theory of defective design, but rather are based only on the theory of failure to warn. Since there is no evidence that the United States Government or any of its military branches, specifically instructed manufacturers from which it purchased asbestos-containing products not to warn about the health hazards associated with exposure to asbestos, there can be no valid claim

919474.1                                    13

to federal jurisdiction pursuant to federal enclave, federal officer or federal contractor provisions of the United States Code.   This disclaimer pertains to all of Plaintiffs' claims, including those of negligence and products liability, as asserted herein.

### JURY DEMAND

Plaintiffs demand trial by jury as to all issues of fact so triable.

SZAFERMAN, LAKIND,
   BLUMSTEIN & BLADER, P.C.
Attorneys for Plaintiffs

By: _____
        Robert E. Lytle, Esq.

Dated: November 14, 2013

### DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:25-4, notice is hereby given that Moshe Maimon, Esq. is designated as trial counsel in the above captioned matter.

SZAFERMAN, LAKIND,
   BLUMSTEIN & BLADER, P.C.
Attorneys for Plaintiffs

By: _____
        Robert E. Lytle, Esq.

Dated: November 14, 2013

919474.1                                      14

## DEMAND FOR INTERROGATORIES

Pursuant to the Asbestos Litigation General Order, Section VI.B. which can be found at http://www.judiciary.state.nj.us/mass-tort/asbestos/manual/generalorder1.pdf, Plaintiff hereby demands that the above listed Defendants answer Standard Interrogatories in the form prescribed by the Court and within the time provided by the above referenced Order. A copy of the Standard Interrogatories are contained in the Asbestos Manual and may be obtained from the Clerk or by visiting the following website: http://www.judiciary.state.nj.us/mass-tort/asbestos/manual/attache.pdf

                                SZAFERMAN, LAKIND,
                                  BLUMSTEIN & BLADER, P.C.
                                Attorneys for Plaintiffs

                          By: _____
                                Robert E. Lytle, Esq.

Dated: November 14, 2013

## CERTIFICATION PURSUANT TO R. 4:5-1

Pursuant to Rule 4:5-1, I certify that the matter in controversy is not the subject of any other action pending in any court, or of a pending arbitration proceeding, that no other action or arbitration proceeding is contemplated, and that I am not aware of any non-party who should be joined in this action

919474.1                          15

pursuant to R. 4:28 or who is subject to joiner pursuant to R. 4:29-1 (b) because of potential liability to any party on the basis of the same facts.

I further certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are wilfully false that I am subject to punishment.

SZAFERMAN, LAKIND, BLUMSTEIN & BLADER, P.C.
Attorneys for Plaintiffs

By: _____
Robert E. Lytle, Esq.

Dated: November 14, 2013

919474.1

16

Szaferman, Lakind,
  Blumstein & Blader, P.C.
101 Grovers Mill Road, Suite 200
Lawrenceville, N.J. 08648
(609) 275-0400

Levy Phillips & Konigsberg, LLP
101 Grovers Mill Road, Suite 105
Lawrenceville, N.J. 08648
(609) 720-0400

Attorneys for Plaintiffs
Attorney ID No. 046331990

SUPERIOR COURT
MIDDLESEX COUNTY
RECEIVED & FILED

NOV 15 2013

GREGORY EDWARDS
DEPUTY CLERK
OF SUPERIOR COURT

| | |
|---|---|
| ARTHUR HAMMELL and LINDA HAMMELL,, <br><br> Plaintiffs, <br><br> v. <br><br> AIR & LIQUID SYSTEMS CORPORATION, et al., <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY <br> LAW DIVISION - MIDDLESEX COUNTY <br><br> DOCKET NO.: MID-L-      -13AS <br><br> **Civil Action - Asbestos Litigation** <br><br> INITIAL FACT SHEET <br><br> MID-L- 0 0 7 2 9 6-1 3 AS |

| | | |
|---|---|---|
| 1. | Full Name: | Arthur Hammell |
| 2. | Date of Birth: | January 21, 1943 |
| 3. | Address: | 6404 South Newport Court <br> Centennial, Colorado 80111 |
| 4. | Union/Local/Years of Membership: | Local 177 Teamsters <br><br> 1965-1984 |
| 5. | Date of first claimed asbestos exposure: | Approximately early 1950s |
| 6. | Date of last claimed asbestos exposure: | Approximately through the 1970s |
| 7. | Smoking History: | Yes |
| 8. | State the inclusive dated of smoking history, the products smoked and the amount of product consumed per day: | |

921343.1

| a. | Dates: | 1960-1984 |
|---|---|---|
| b. | Products smoked: | L&M Cigarettes (filtered) |
| c. | Amount per day: | 3/4 of a pack a day |

9. Provide as much of the following information as is presently available: work sites, inclusive dates and trade or occupation for each site:

| WORK SITES: | DATES: | TRADE/OCCUPATION |
|---|---|---|
| Various Sites in NJ | 1953-1962 | Construction activities |
| Raritan Arsenal | 1961-62 | Electrician's helper |
| Various Sites in NJ | 1959-1970s | Automotive repair work on personal vehicles and those of friends and family |
| US Navy | 1962-1964 | Boilerman |
| UPS | 1964-1979 | Return Clerk |

10. State the claimed asbestos related diseases; include the date of diagnosis and the name of the diagnosing physician or institution (if available attached a copy of the medical report).

| a. | Disease: | Mesothelioma |
|---|---|---|
| b. | Date of Diagnosis: | Approx. July 2013 |
| c. | Doctor/ Institution: | Dr. Franklin University of Colorado Hospital |

SZAFERMAN, LAKIND,
BLUMSTEIN & BLADER, P.C.
Attorneys for Plaintiff


By:   Robert E. Lytle, Esq.


Dated: November _14_, 2013

921343.1

Appendix XII-B1

| CIVIL CASE INFORMATION STATEMENT (CIS) | FOR USE BY CLERK'S OFFICE ONLY |
|---|---|
| Use for initial Law Division Civil Part pleadings (not motions) under *Rule* 4:5-1. **Pleading will be rejected for filing, under *Rule* 1:5-6(c), if information above the black bar is not completed or attorney's signature is not affixed.** | PAYMENT TYPE: ☐ CK ☐ CG ☐ CA |
| | CHG/CK NO.: |
| | AMOUNT: |
| | OVERPAYMENT: |
| | BATCH NUMBER: |

| ATTORNEY/PRO SE NAME Robert E. Lytle, Esq. - Attorney ID No. 046331990 | TELEPHONE NUMBER 609   275-0400 | COUNTY OF VENUE **Middlesex County** |
|---|---|---|
| FIRM NAME (If applicable) **Szaferman, Lakind, Blumstein & Blader, P.C.** | | DOCKET NUMBER (when available) **MID-L-        13AS** |
| OFFICE ADDRESS 101 Grovers Mill Road, Suite 200 Lawrenceville, New Jersey  08648 | | DOCUMENT TYPE **Complaint** |
| | | JURY DEMAND  ☒ YES    ☐ NO |

| NAME OF PARTY (e.g., John Doe, Plaintiff) **Arthur Hammell and Linda Hammell** | CAPTION **Hammell, et al. vs. Air & Liquid Systems Corporation, et al.** |
|---|---|

| CASE TYPE NUMBER (See reverse side for listing) **601** | HURRICANE SANDY RELATED? ☐ YES   ☒ NO | IS THIS A PROFESSIONAL MALPRACTICE CASE?   ☐ YES   ☒ NO |
|---|---|---|
| | | IF YOU HAVE CHECKED "YES," SEE *N.J.S.A.* 2A:53A-27 AND APPLICABLE CASE LAW REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT. |

| RELATED CASES PENDING? ☐ YES   ☒ NO | IF YES, LIST DOCKET NUMBERS |
|---|---|
| DO YOU ANTICIPATE ADDING ANY PARTIES (arising out of same transaction or occurrence)? ☐ YES   ☒ NO | NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY (If known) ☐ NONE    ☐ UNKNOWN |

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE.**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

| DO PARTIES HAVE A CURRENT, PAST OR RECURRENT RELATIONSHIP? ☐ YES   ☒ NO | IF YES, IS THAT RELATIONSHIP ☐ EMPLOYER-EMPLOYEE   ☐ FRIEND/NEIGHBOR   ☐ OTHER (explain) _____ ☐ FAMILIAL   ☐ BUSINESS   _____ |
|---|---|

| DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY?   ☐ YES   ☒ NO |
|---|

USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR ACCELERATED DISPOSITION:

> SUPERIOR COURT
> MIDDLESEX COUNTY
> RECEIVED & FILED
>
> NOV 15 2013
>
> GREGORY EDWARDS
> DEPUTY CLERK
> OF SUPERIOR COURT

| ♿ DO YOU OR YOUR CLIENT NEED ANY DISABILITY ACCOMMODATIONS? ☐ YES   ☒ NO | IF YES, PLEASE IDENTIFY THE REQUESTED ACCOMMODATION: |
|---|---|
| WILL AN INTERPRETER BE NEEDED? ☐ YES   ☒ NO | IF YES, FOR WHAT LANGUAGE: |

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b).

| ATTORNEY SIGNATURE | |
|---|---|
|  | Robert E. Lytle, Esq. |



## SIDE 2

# CIVIL CASE INFORMATION STATEMENT
## (CIS)
### Use for initial pleadings (not motions) under *Rule* 4:5-1

**CASE TYPES** (Choose one and enter number of case type in appropriate space on the reverse side.)

**Track I — 150 days' discovery**

| | |
|---|---|
| 151 | NAME CHANGE |
| 175 | FORFEITURE |
| 302 | TENANCY |
| 399 | REAL PROPERTY (other than Tenancy, Contract, Condemnation, Complex Commercial or Construction) |
| 502 | BOOK ACCOUNT (debt collection matters only) |
| 505 | OTHER INSURANCE CLAIM (INCLUDING DECLARATORY JUDGMENT ACTIONS) |
| 506 | PIP COVERAGE |
| 510 | UM or UIM CLAIM (coverage issues only) |
| 511 | ACTION ON NEGOTIABLE INSTRUMENT |
| 512 | LEMON LAW |
| 801 | SUMMARY ACTION |
| 802 | OPEN PUBLIC RECORDS ACT (SUMMARY ACTION) |
| 999 | OTHER (briefly describe nature of action) _____ |

**Track II — 300 days' discovery**

| | |
|---|---|
| 305 | CONSTRUCTION |
| 509 | EMPLOYMENT (other than CEPA or LAD) |
| 599 | CONTRACT/COMMERCIAL TRANSACTION |
| 603N | AUTO NEGLIGENCE - PERSONAL INJURY (non-verbal threshold) |
| 603Y | AUTO NEGLIGENCE - PERSONAL INJURY (verbal threshold) |
| 605 | PERSONAL INJURY |
| 610 | AUTO NEGLIGENCE - PROPERTY DAMAGE |
| 621 | UM or UIM Claim (includes bodily injury) |
| 699 | TORT – OTHER |

**Track III — 450 days' discovery**

| | |
|---|---|
| 005 | CIVIL RIGHTS |
| 301 | CONDEMNATION |
| 602 | ASSAULT AND BATTERY |
| 604 | MEDICAL MALPRACTICE |
| 606 | PRODUCT LIABILITY |
| 607 | PROFESSIONAL MALPRACTICE |
| 608 | TOXIC TORT |
| 609 | DEFAMATION |
| 616 | WHISTLEBLOWER/CONSCIENTIOUS EMPLOYEE PROTECTION ACT (CEPA) CASES |
| 617 | INVERSE CONDEMNATION |
| 618 | LAW AGAINST DISCRIMINATION (LAD) CASES |

**Track IV — Active Case Management by Individual Judge/450 days' discovery**

| | |
|---|---|
| 156 | ENVIRONMENTAL/ENVIRONMENTAL COVERAGE LITIGATION |
| 303 | MT. LAUREL |
| 508 | COMPLEX COMMERCIAL |
| 513 | COMPLEX CONSTRUCTION |
| 514 | INSURANCE FRAUD |
| 620 | FALSE CLAIMS ACT |
| 701 | ACTIONS IN LIEU OF PREROGATIVE WRITS |

**Multicounty Litigation (MCL) (Track IV)**

| | | | |
|---|---|---|---|
| 266 | HORMONE REPLACEMENT THERAPY (HRT) | 288 | PRUDENTIAL TORT LITIGATION |
| 271 | ACCUTANE/ISOTRETINOIN | 289 | REGLAN |
| 274 | RISPERDAL/SEROQUEL/ZYPREXA | 290 | POMPTON LAKES ENVIRONMENTAL LITIGATION |
| 278 | ZOMETA/AREDIA | 291 | PELVIC MESH/GYNECARE |
| 279 | GADOLINIUM | 292 | PELVIC MESH/BARD |
| 281 | BRISTOL-MYERS SQUIBB ENVIRONMENTAL | 293 | DEPUY ASR HIP IMPLANT LITIGATION |
| 282 | FOSAMAX | 295 | ALLODERM REGENERATIVE TISSUE MATRIX |
| 284 | NUVARING | 296 | STRYKER REJUVENATE/ABG II MODULAR HIP STEM COMPONENTS |
| 285 | STRYKER TRIDENT HIP IMPLANTS | 297 | MIRENA CONTRACEPTIVE DEVICE |
| 286 | LEVAQUIN | 601 | ASBESTOS |
| 287 | YAZ/YASMIN/OCELLA | 623 | PROPECIA |

If you believe this case requires a track other than that provided above, please indicate the reason on Side 1, in the space under "Case Characteristics."

Please check off each applicable category:    ☐ **Putative Class Action**    ☐ **Title 59**

Powered by


Printed by ALL-STATE LEGAL®
A Division of ALL-STATE International, Inc.
www.aslegal.com    800.222.0510    Page 2

# Exhibit B

### AFFIDAVIT OF ADMIRAL BEN J. LEHMAN, U.S. NAVY, RETIRED
### IN SUPPORT OF FOSTER WHEELER'S NOTICE OF REMOVAL

I, Ben J. Lehman, understanding and being under the penalty of perjury, declare:

1.     I am a Rear Admiral, Retired, of the United States Navy [U.S. Navy]. I received notice of my commission as an Ensign in April, 1942 and commenced active duty in the U.S. Navy on June 1, 1942. Immediately prior to commencing active duty in the U.S. Navy, I attended the College of the City of New York. I had been a "student engineer" at the Mack Manufacturing Co. [Mack Trucks] in Allentown, PA and had been enrolled as a special student at Lehigh University, Bethlehem, PA from June 1941 until January 1942. I returned to the College of the City of New York in order to complete my course work there and then enter military service. I had already completed two years of U.S. Army ROTC. On entering active duty, the U.S. Navy ordered me to study naval architecture and marine Engineering at the Massachusetts Institute of Technology [MIT]. Later, I was ordered to the U.S. Naval Academy Post-Graduate School at Annapolis [now the U.S. Navy Post-Graduate School in Monterey, CA]. I received a Master of Science [SM] from Harvard University in 1949. I studied Design Philosophy and Advanced Stress Analysis at Stanford University in 1957 and 1958. In the U.S. Navy, I served as a Ship Superintendent and Dry Docking Officer at the New York Naval Shipyard [formerly the Brooklyn Navy Yard], between 1942 and 1944, as a Ship Superintendent at the San Francisco Naval Shipyard from September 1950 to May 1952, and as a Planning Officer at the Assistant Industrial Manager, San Francisco from 1952 to 1954. In the Navy, I have always been an Engineering Duty Officer. I was promoted to Rear Admiral in 1977 in the Naval Reserve. I was employed as an engineer by the General Electric Co. between 1946 and 1958, and by the Bethlehem Steel Co.'s Shipbuilding Division in 1949 and 1950. I held the positions of Director of Engineering at a major shipbuilding company in Seattle, WA from 1969 to 1972 and of Vice President of Engineering in

Pascagoula, MS from 1972 to 1975. During all these periods I have maintained close contact with the U.S. Navy. During times of civilian employment, I have had periods of active duty in the Department of Defense [DOD], the Naval Sea Systems Command [NAVSEA] in Washington, D.C., and shipyards. My experience has caused me to be thoroughly familiar with U.S. Navy specifications by means of which the U.S. Navy controlled its contracts and inspection procedures, and thereby controlled its suppliers. Since my retirement in 1982 my specific knowledge of new procedures has decreased. I have been an independent consultant since 1975. I have personal knowledge of the facts herein.

2.    I submit this Affidavit in support of Foster Wheeler's Notice of Removal to attest to the levels of direction, control, and supervision exercised by the U.S. Navy over the design and manufacture of equipment, including boilers and their auxiliary equipment [collectively referred to as "boilers"] designed and constructed for installation on ships of the U.S. Navy.

3.    During my service in the U.S. Navy as a Ship Superintendent, I was personally involved with supervision and oversight of ship's overhauls and alterations. I was fully aware that only boilers especially designed and built for the propulsion of U.S. Navy combat vessels, including Foster Wheeler boilers, could be installed. These were designed and manufactured in accordance with detailed specifications written, approved, and issued by the U.S. Navy, specifically NAVSEA or its predecessors, including the Bureau of Engineering.

4.    The U.S. Navy chain of command concerning ship construction comprised several layers. The Secretary of the Navy [subject to the President and Congress] had the ultimate authority related to contractual and technical control. An Under Secretary was directly concerned with ship acquisitions. The Under Secretary position has now been eliminated, and that authority now rests with the Chief of Naval Operations who provides NAVSEA with the

desired ship characteristics, and oversees its performance. In the 1930s, Foster Wheeler, as a boiler and heat exchanger manufacturer, was under the cognizance of the Bureau of Engineering. The representative of that Bureau at the plant was an Inspector of Naval Machinery. The Bureau of Engineering and the Bureau of Construction and Repair were combined in 1940 to create the Bureau of Ships for a time Approvals were required from both the Inspector of Machinery and the Supervisor of Shipbuilding for the lead ships of a class. Later, the Inspectors of Naval Machinery were renamed Inspectors of Naval Material. About 1958, the Bureau of Ordnance was merged with the Bureau of Ships to form NAVSEA. As a reduction in the pace of shipbuilding continued, routine inspection responsibilities were assumed by a new organization: the Defense Contract Administration Services Agency [DCASA]. This organization had many responsibilities, but lesser technical qualifications. Technical questions were referred to the Bureaus [Commands] in Washington. Throughout all of these reorganizations there were no changes in the ultimate authorities or the responsibilities of those authorities. Suppliers of equipment and the builders of ships have had the U.S. Navy's acceptance of their products determined by representatives of different organizations at different times but NAVSEA or its predecessors always had the ultimate authority and the professional competence to accept or reject them.

5.    Under NAVSEA, as under its predecessors, the U.S. Navy's shipbuilding and acquisition of equipment for the ships comprised several levels of authority. Detailed technical control over ship design, construction, repair, and inspection was in NAVSEA. The Commander of Naval Supply Systems Command [NAVSUP] had contractual control of some procurements. Each of these two organizations had oversight responsibilities regarding, among other things, boilers manufactured for U.S. Navy vessels. Compliance with the specifications and standards was directly monitored by Inspectors of Naval Machinery under both these divisions: those

under NAVSUP generally worked on site at the supplier's [in this case Foster Wheeler's] manufacturing facilities and Machinery Superintendents or Inspectors of Naval Machinery carried out their responsibilities at the shipbuilding yards. Moreover, it was common in my experience for technical personnel from the Propulsion Equipment Groups of NAVSEA to inspect the manufacturing and quality assurance processes at supplier's plants and the boiler erection and inspection procedures at the shipyards. In my experience, it was machinery inspectors who exercised primary, front line control over the work performed for the Navy by suppliers such as Foster Wheeler in the production of boilers and other equipment. The Inspectors of Naval Machinery [or those with other titles who succeeded them] were responsible for assuring that contractors such as Foster Wheeler complied with the contract specifications every detail. Further, the Inspectors of Naval Machinery would report to their superiors any violations of, or failures to comply with specifications, refuse to apply their stamp of approval, and not authorize shipment. This was true whether the installation was to be done by government shipyards or government contract shipyards.

5.   The U.S. Navy retained the "final say" over the design of any piece of equipment, and made the ultimate decisions, whether engineering or contractual.

6.   Further, I can attest that the military specifications for boilers and other equipment intended for use on vessels of the U.S. Navy, known as "MilSpecs", were drafted, approved, and maintained by the U.S. Navy, specifically NAVSEA or its predecessors, to encompass all aspects of shipboard equipment, including the material requirements.

7.   These contract specifications reflected the state of the art and the special needs of vessels destined for combat. NAVSEA maintained and controlled the MilSpecs because it had direct contact with the forces afloat and the shipyards, and therefore superior knowledge of the

demands and requirements of vessels ready for combat, and the availability of processes and materials.

8.     The U.S. Navy's unique specifications for boilers were communicated to boiler suppliers such as Foster Wheeler when the U.S. Navy, either directly or through its contractors, issued a negotiated contract or a Request for Proposal for equipment. The U.S. Navy specifications included the nature of any communication affixed to boilers or other equipment supplied to the U.S. Navy.

9.     The U.S. Navy had complete control. It could not, and did not, permit its contractors to implement any changes. Every aspect of every item needed to be controlled because:

    a.    it had to be consistent with the ability of the crew to operate the ship, especially on its combat missions;

    b.    it had to be compatible with the ability of the crew to maintain the ship and perform emergency repairs during its service using materials and parts carried on board when shipyard assistance was not available;

    c.    every item had to be functionally compatible, fit in the space available, and be maintainable and operable with materials available from the U.S. Navy's supply system.

10.     The U.S. Navy had complete control over every aspect of every piece of equipment. Military specifications governed every significant characteristic of the equipment used on U.S. Navy ships, including the instructions and warnings. Drawings for nameplates, the texts of instruction manuals, and every other document relating to construction, maintenance, and operation of the vessel was approved by the U.S. Navy. This control included the decision of which warnings should or should not be included. Thereby, the U.S. Navy controlled the decisions with regard to instructions and warnings on every piece of equipment. The U.S. Navy would not, and could not, permit any equipment manufacturer or supplier to interfere with the Navy's mission by placing warnings on any equipment [or in any instructions or manuals which accompanied the

equipment] on any U.S. Navy ships or in any shipyards in which U.S. Navy ships were built or repaired that might cause Sailors or workers to deviate from their mission or require the U.S. Navy to devote scarce resources to programs it deemed not essential, in its unilateral view.

11.    In addition to specifications for the design and manufacture of the equipment itself, the U.S. Navy also had detailed specifications that governed the form and content of the written materials to be delivered with the equipment, including boilers, supplied to the U.S. Navy. The U.S. Navy was intimately involved with and had final approval of all technical and engineering drawings, operating manuals, safety or hazard information and any other written information that accompanied or related to any piece of equipment. The U.S. Navy determined the nature of hazards to be subject to any precautionary labeling and the content of such labeling. In short, the U.S. Navy dictated every aspect of the design, manufacture, installation, overhaul, written documentation and warnings associated with its ships and did not permit deviation from any of its contractors.

12.    The U.S. Navy would never permit a supplier to suggest, advise, or require any actions that would be disruptive to the normal operation of the ship in its primary function of defending our Country. Procedures for operation were taught and enforced by officers of all ranks; from Petty Officers to Captains. Any written material regarding procedures for working around boilers that differed would have interfered with the normal and necessary operations of U.S. Navy ships. Indeed, in its specifications for manuals the U.S. Navy specifically limited warning information to items and events dealing with the operation of equipment. By definition, the application or removal of insulation would not have been included.

13.    Asbestos was rampant throughout U.S. Navy ships. Sailors and civilian personnel were exposed at all times when they were aboard ships regardless of where they were stationed or where they worked. In order to protect all these individuals from exposure to asbestos, the U.S.

Navy would have had to allocate scarce resources to provide respiratory protection for all sailors and workers every hour of every day that they were on board. Implementing wet down procedures and creating containment areas would also have been required to implement effective industrial hygiene programs. The U.S. Navy made a conscious decision on allocation of its resources in light of its knowledge of the hazards of asbestos and its mission to protect our Country. The U.S. Navy conducted extensive research concerning the hazard of exposure to asbestos starting in the 1930's. In the early 1940's, the Navy's Bureau of Medicine and Surgery, in coordination with the U.S. Maritime Commission, set standards based on the report of Dr. Drinker and Fleischer and Marr. Through its participation in government programs and conferences into the 1980's, the Navy stayed abreast of the latest information, including the results of research. The U.S. Navy made a conscious and informed decision about how asbestos would be used on its ships and how exposures would be controlled, if at all, on its ships.

14. The U.S. Navy would not have allowed its equipment suppliers, such as Foster Wheeler, to affix any warning related to any asbestos hazards on their equipment. This would have included boilers. Further, the U.S. Navy would not have allowed Foster Wheeler to place any warnings related to asbestos hazards in any written material provided by Foster Wheeler to the U.S. Navy or to a U.S. Navy contractor in accordance with its contracts, including its technical and operations manuals. To do so would have interfered with the U.S. Navy's mission and control of its ships and personnel.

I declare under penalty of perjury that the foregoing is true and correct, and that if called as a witness, I could competently testify to the foregoing facts, all of which are within my own personal knowledge.

Ben J. Lehman, Rear Admiral, U.S. Navy, Ret.

Before me, the undersigned officer, personally appeared Ben J. Lehman, Rear Admiral, U.S. Navy, Ret. known to me to be the person whose name is subscribed to the within instrument, and acknowledged that he executed the same for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seal acknowledge.

Executed this 12th day of July 2007.

On this 12 day of 07, 2007, before me, a Notary Public,

Josh Martin

MY COMMISSION EXPIRES August 28, 2010



JOSH MARTIN
NOTARY PUBLIC
STATE OF NEVADA
APPT. No. 06-109087-5
MY APPT. EXPIRES AUGUST 28, 2010

# BEN J. LEHMAN

*Professional Engineer*
*Certified Safety Professional*
*Rear Admiral U.S. Naval Reserve [Engineering Duty] Retired*



Registered Professional Engineer in New York 1949, California 1953, Alabama 1976, Louisiana 1976, Certified Safety Professional by the Board of Certified Safety Professionals 1979.

## Education:

- C.C.N.Y. -B.M.E.
- Manhattan College - Industrial Psychology and Safety
- Pratt Institute - Electronics
- U.S. Naval Academy Post - Post-Graduate School - Electrical and Mechanical Engineering
- Harvard University - Mechanical & Chemical Engineering - M.S. in Mechanical Engineering
- Stanford University - Design and Analysis courses
- Editor-In-Chief C.C.N.Y. Vector; Honorary Fraternity; Tau Beta PI.

## Experience:

- Student Engineer, Mack Truck Co. Allentown PA
- U.S. Navy Shipyard Management and Contract Administration, 1942-46 &1950-54
- Engineer, General Electric Co. Schenectady NY 1946-1948
- Engineer, Bethlehem Steel Co. Shipbuilding Div. Quincy MA 1949-1950
- Engineer, power plant construction & safety, refinery design Bechtel Corp. San Francisco CA 1954-1955
- Project Engineer, Sylvania Electric 1955
- Project Engineer Kaiser Aircraft & Electronics 1956
- Project Engineer Beckman Instruments 1957-59
- Engineering Manager, Lockheed Missiles and Space Co. Sunnyvale CA 1959-69
- Director of Engineering, Lockheed Shipbuilding&Construction Co. Seattle WA 1969-72;
- Vice-President of Engineering, Litton Industries Ship Systems Los Angeles and Ingalls Shipbuilding. Pascagoula MS 1972-1975.
- Independent Consultant 1975-Present.

## Professional Societies:

- American Society of Safety Engineers
- Systems Safety Society
- Risk Analysis Society
- Society of Automotive Engineers
- Institute of Electrical and Electronic Engineers [IEEE]
- American Society of Naval Architects & Marine Engineers
- American Society of Naval Engineers
- American Boat and Yacht Council
- Panelist, American Arbitration Association

P.O. Box 3480, 169 Juniper Drive-Stateline, Lake Tahoe NV 89449-3480
Phone (702) 588-7765 - e-mailbmechelen@sierra.net - FAX (702) 588-5577

Homepage - My Objectives - A Generalist - A Specialist - CV - Send Email

Exhibit C

1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

--oOo--


ROBERT NESBIET,

         Plaintiff,

    vs.                   No. 04-CV-9321 (SAS)

GENERAL ELECTRIC
COMPANY, et al.,

        Defendants.

_____/

ORIGINAL


DEPOSITION OF

BEN LEHMAN

------------------------------------

Monday, March 21, 2005


REPORTED BY:   DIANE K. LUSICH, Nevada CSR NO. 181
                               Calif. CSR NO. 5218
Job No. L05-121

Evergreen Reporting
Certified Court Reporters
Post Office Box 10539
Zephyr Cove, Nevada 89448
775.588.6630

32

but was that sort of a regular practice, when there was a trial run, or something with the equipment was being used for the first time, at times the manufacturer would come down and make sure everything was okay?

A.   No, not really.  Not unless he was called.

Q.   So the Navy would call if there was a particular issue?

A.   Correct.

Q.   Is it fair to say that you don't know whether or not General Electric, either on its turbines or other pieces of equipment that were being installed or repaired or maintained at the Brooklyn Navy Yard or the San Francisco Navy Yard, ever had a warning on them about the hazards of asbestos?

A.   I never saw one.

Q.   All right.  Do you know if they ever suggested to the Navy that there should be one, and the Navy said no, you can't do that?

A.   I have no knowledge of any such thing.

Q.   Do you know whether or not in any manual for any piece of General Electric equipment at any time while you were in the Navy had any cautionary note or warning about the hazards of asbestos for the operators and people maintaining the equipment about the hazards of asbestos?

33

A.    No, I do not know.

Q.    Is it fair to say you know of no reason why the Navy wouldn't have allowed that if GE had suggested it in the manual?

MR. SPEZIALI:  Jerry, objection.  Wouldn't have allowed what?

MR. KRISTAL:  Q.  Wouldn't have allowed General Electric to put a warning about the hazards of asbestos in its manuals.  Or do you not know the answer to that question, one way or the other?

A.    Well, I don't think that -- what time period are we referring to?

Q.    Well, let me ask this.  During the time that you were in the Brooklyn Navy Yard or in the San Francisco Navy Yard, were you involved in the process whereby manuals for equipment were written?

A.    No.

Q.    Do you have any knowledge, for any piece of equipment by any manufacturer at any time that you were on active duty in the Navy, whether a manufacturer had suggested some sort of safety warning in the manuals that the Navy refused to allow in the manual?  Are you aware of that ever happening?

A.    Safety warnings in general?

No, I am not aware that the Navy ever refused

34

to permit a safety warning.

MR. KRISTAL:  Diane, if you could hand Admiral Lehman Exhibit 1, which has a "1" and then "B."   It's the Notice of Deposition with attachment.

MR. SPEZIALI:  Okay.

MR. KRISTAL:  Q.  I understand from counsel -- strike that.

Admiral Lehman, have you seen this Exhibit 1? I know 1-B is your affidavit, and we will get to that in a minute, but the first part --

A.  No, I have never seen that.

Q.  We had given it to counsel for General Electric, and he informed us that the only thing that you had responsive to the requests for documents, which is the second page, was a curriculum vitae, which he was kind enough to give to us.

A.  That's right, that is the only document I had.

Q.  Okay.  You had a conversation, then, with a GE lawyer, and they at least asked you about these types of materials we were requesting?

MR. SPEZIALI:  No, Jerry, he hadn't seen the first page, but I believe he was sent the second page, the Exhibit A.

Am I right on that?

THE WITNESS:  Yes, we had a conversation, and I

77

you expect the crew to do?

Q. No, let me backtrack, so we don't get side lined here.

At all times when you were in the Navy you had nothing to do with any decision about whether or not the Navy would permit any warnings about asbestos or any other hazardous material, correct.

A. That's correct.

Q. And you have never spoken to anybody about that subject, correct?

A. About?

Q. Other than the lawyers, perhaps?

A. Repeat that question exactly.

Q. Sure. When you were at the Navy, you never spoke to anybody about the subject of whether or not the Navy would permit any warnings about asbestos and the hazards of breathing asbestos by an equipment manufacturer or anybody else, right?

A. When I was on active duty, that is correct.

Q. And you never read anything at any point in time as to whether or not the Navy would have allowed that?

A. That's correct.

Q. Is it fair to say that you don't know whether or not an equipment manufacturer, such as General

78

Electric, ever even suggested putting a warning either on the outside of the turbine or in a manual about the hazards of breathing asbestos?

A.    That is correct.

Q.    So would it be fair to say, then, that you would be speculating as to what the Navy's response would be if it was never even suggested by General Electric or any other equipment manufacturer?

A.    That's incorrect.

Q.    Well, if you never spoke to anybody about it, you weren't responsible for the decision and you have never read anything about it, what other than speculation is there?

A.    I knew what the requirements were on the operation of the ship. I knew what materials and the equipment they had on board the ships. I was on board the ships every day.

Q.    I believe you are mixing something up. I am not talking about what the Navy had available, I am talking about whether or not the Navy would have allowed a warning.

Are you with me?

A.    Yes.

Q.    So if the Navy allowed warnings on solvent bottles, for example, they certainly allowed safety

125

You said nothing else. Well, that is not exactly true.

Q. I am not asking you about documents now, I am talking about the basis of your opinion about the Navy and allowing warnings, what you told us before, i.e., your experience, right?

A. Correct.

Q. And you haven't spoken to anyone about that issue, right?

A. My experience is what it is.

Q. You haven't spoken to anyone about that issue, anyone in the Navy who could make that decision; is that correct?

A. Correct.

Q. And you haven't read anything written by the Navy on that issue, correct?

A. Nothing that applied to the time period that we are talking about.

Now, as we discussed earlier, my situation in the later years, 1969 on, was different.

Q. And you weren't having discussions then about what the Navy would or wouldn't allow as to warnings?

MR. SPEZIALI: You mean in the earlier years, Jerry?

MR. KRISTAL: No, in the later years.

126

THE WITNESS: From 1969 to 1972 I do not recall any such discussion. With regard to 1972 through 1975 I might well have participated in such discussions. I don't recall a specific one, but certainly I could have participated in such discussions.

MR. KRISTAL: Q. And you have never researched the question as to whether or not the Navy would allow an equipment manufacturer such as General Electric to provide a warning with respect to the hazards of asbestos?

A. Again, with regard to 1972 to 1975, I probably would have known what the Navy would and would not allow. Before that, no.

MR. KRISTAL: Okay, that is all I have. Thanks.

MR. SPEZIALI: I just -- I had one last question that I wanted to ask before and I forgot, and I just think to be fair for the record I should ask it.

MR. KRISTAL: Of course.

FURTHER EXAMINATION

BY MR. SPEZIALI:

Q. Admiral Lehman, Mr. Kristal asked you about your website, and he pointed out the part that said for twenty years you have been assisting lawyers.

Do you recall him pointing that out?