**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LINDA HAMMELL, individually and as Executrix and Executrix ad Prosequendum of the Estate of ARTHUR HAMMELL, | |
| Plaintiff, | Civil Action No. 14-00013 (MAS) (TJB) |
| v. | **MEMORANDUM OPINION** |
| AIR & LIQUID SYSTEMS CORPORATION, et al., | |
| Defendants. | |

**SHIPP, District Judge**

This matter comes before the Court upon Defendant CBS Corporation's ("Westinghouse") Motion for Summary Judgment (ECF No. 346) and Defendant Foster Wheeler Energy Corporation's ("Foster Wheeler") Motion for Summary Judgment (ECF No. 347). Plaintiff Linda Hammell ("Plaintiff"), individually and as Executrix and Executrix ad Prosequendum of the Estate of Arthur Hammell ("Mr. Hammell"), opposed both Motions. (ECF Nos. 352–356.) Replies were filed by Westinghouse (ECF Nos. 360–61) and Foster Wheeler (ECF Nos. 362–63) (collectively, "Defendants"). The Court has carefully considered the parties' arguments and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth herein, Defendants' Motions for Summary Judgment are denied.

I.  **BACKGROUND**[1]

This case arises from Mr. Hammell's death from mesothelioma caused by exposure to asbestos. (Pl.'s Consolidated Statement of Undisputed Facts ("Pl.'s SUMF") ¶ 2, ECF No. 352-2; Foster Wheeler Statement of Undisputed Material Facts ("Foster Wheeler SUMF") ¶ 1, ECF No. 347-2.)

Mr. Hammell enlisted in the Naval Reserve in 1960, and served on active duty in the United States Navy from April 1962 through September 1964. (Pl.'s SUMF ¶ 4; Foster Wheeler SUMF ¶ 1; Westinghouse's Statement of Undisputed Material Facts ("Westinghouse SUMF") ¶ 1, ECF No. 346-2.) While on active duty, he was assigned to the U.S.S. *Charles H. Roan* (the "*Roan*"), first while the vessel underwent a fleet rehabilitation and modernization overhaul at the Brooklyn Navy Yard and then while the vessel was at sea. (Westinghouse SUMF ¶ 1; Foster Wheeler SUMF ¶ 1; Pl.'s SUMF ¶ 5, 11–13.)

On the *Roan*, Mr. Hammell served in the forward fireroom. (Westinghouse SUMF ¶ 1; Foster Wheeler SUMF ¶ 2; Pl.'s SUMF ¶¶ 6, 12–13.) The forward fireroom was a "tight" room." (Pl.'s SUMF ¶¶ 9, 51.) Inside, "there is no such thing as ventilation. There's no[] kind of air-conditioning or air circulation. It's just a hot, dusty, dirty, oily spot." (*Id.* ¶ 66.) In the forward fireroom, whether at the Brooklyn Navy Yard or at sea, Mr. Hammell maintained boilers, forced draft blowers, valves, and pumps, among other equipment. (Westinghouse SUMF ¶¶ 1–2; Foster Wheeler SUMF ¶¶ 2–3; Pl.'s SUMF ¶¶ 6, 12–13.)

---

[1] The Court sets forth only those material facts necessary to decide the motion. All facts are undisputed unless otherwise noted. Because Defendants' statements of undisputed material facts often overlap and Plaintiff submits a consolidated statement of material facts in opposition to both Motions, the Court discusses the material facts relevant to both Motions together.

A.  **Westinghouse Forced Draft Blowers**

Four forced draft blowers ("FDBs"), manufactured by Westinghouse, were installed in the forward fireroom. (Westinghouse SUMF ¶ 2; Pl.'s SUMF ¶ 51.) Westinghouse furnished these FDBs to the Navy in the 1940s. (Westinghouse SUMF ¶ 2.) The *Roan*'s FDBs were designed and manufactured in compliance with Navy design specifications and were only accepted after the Navy inspected and tested the FDBs for compliance. (*Id.* ¶ 8.) The use of asbestos in or with the FDBs was either expressly required by Navy specifications or was considered and approved by the Navy. (*Id.* ¶¶ 9–10.)

When the *Roan* was constructed, the Navy's specifications allowed Westinghouse to use either asbestos-containing gaskets or gaskets that did not contain asbestos. (*Id.* ¶ 13; Westinghouse's Resp. Pl.'s SUMF ¶ 75, ECF No. 361.) At the time of sale, the Westinghouse FDBs incorporated gaskets that contained asbestos. (Westinghouse SUMF ¶ 2.) Westinghouse-produced design drawings for the FDBs specified the use of gaskets containing asbestos.[2] (Pl.'s SUMF ¶ 53; Westinghouse Resp. Pl.'s SUMF ¶ 53.)

The gaskets on the *Roan*'s FDBs were expected to wear out and periodically require replacement. Replacement gaskets were selected by the Navy based on its specifications. (Westinghouse SUMF ¶ 11.) "If an asbestos-containing part was an original component of an item

---

[2] The parties dispute whether, or to what extent, Westinghouse "*specified* the use of . . . metallic-asbestos gaskets internal to each [FDB] assembly." (Pl.'s SUMF ¶ 53 (emphasis added).) Plaintiff's expert states that the decision to use asbestos-containing gaskets in the *Roan*'s FDBs "more likely than not" originated with Westinghouse. (Westinghouse Resp. Pl.'s SUMF ¶ 53.) Westinghouse asserts that "the mere reference to asbestos gaskets in the Westinghouse-produced detailed design drawings for [the FDBs]" does not establish that the decision to use asbestos-containing gaskets originated with Westinghouse. (*Id.*) Westinghouse asserts that "the choice of asbestos rather than non-asbestos gaskets" may have been made by either the United States Navy or the Navy's architect for the *Roan*, "and then simply reflected in Westinghouse's design drawings once that choice had been made." (*Id.*)

of machinery . . . [the Navy] replaced [the part] with the same type of part, as called out in the drawings, instruction books[,] and technical manuals prepared by the manufacturer," so long as the replacement part conformed to the Navy's specifications at the time of replacement. (Pl.'s SUMF ¶ 22; *see* Westinghouse Resp. Pl.'s SUMF ¶ 22.) The Navy chose to replace the gaskets in the *Roan*'s FDBs with asbestos-containing gaskets through the time Mr. Hammell worked on the *Roan*. (Westinghouse SUMF ¶¶ 2, 11.) There is no evidence Westinghouse supplied the replacement asbestos-containing gaskets on the *Roan*. (*Id.* ¶ 12; Pl.'s Resp. Westinghouse SUMF ¶ 12, ECF No. 352-1.) It is "highly improbable that any of the gaskets Mr. Hammell encountered were original components of the FDBs as [sold by Westinghouse and] purchased by the Navy." (Westinghouse SUMF ¶ 5.) All third-party-made replacement gaskets for the *Roan*'s FDBs contained asbestos. (*Id.* ¶ 2) The Navy began transitioning away from asbestos-containing gaskets in the 1970s. (Westinghouse SUMF ¶ 14; Pl.'s SUMF ¶ 75.)

Mr. Hammell's duties on the *Roan* included removing and replacing gaskets on or in the FDBs in the forward fireroom. (Westinghouse SUMF ¶ 3; Pl.'s SUMF ¶ 60.) After use, the gaskets would become brittle and could break apart. (Pl.'s SUMF ¶ 61.) Replacing the asbestos-containing gaskets required "scrap[ing] the gaskets off with either a paint scraper or pen knife, followed by a wire brush, Brillo pad, or sandpaper." (*Id.* ¶¶ 42, 61.) This work created dust in the air. (Westinghouse SUMF ¶ 3; Pl.'s SUMF ¶ 61.)

### B. Foster Wheeler Boilers

Two boilers, manufactured by Foster Wheeler, were installed in the forward fireroom of the *Roan*. (Pl.'s SUMF ¶¶ 14–15; Foster Wheeler Resp. Pl.'s SUMF ¶¶ 14–15, ECF No. 363; Foster Wheeler SUMF ¶ 11.) Foster Wheeler furnished these boilers for use aboard the *Roan* in 1943. (Foster Wheeler SUMF ¶ 11.) "At the Navy's request, the Foster Wheeler boilers were to be the exact duplicates of the Babcock & Wilcox-designed boilers for the Sumner-Gearing class of

ships, a design which the Navy previously oversaw, reviewed, and approved." (*Id.* ¶ 12.) The Navy supervised and controlled the design, manufacture, testing, and acceptance of the boilers on the *Roan*. (*Id.* ¶ 19.)

As with the Westinghouse FDBs, the Navy was in "full control" of "any maintenance, repair, overhaul[,] or modernization work" on the *Roan*, and dictated the "type of materials to be removed, replaced, or installed in conjunction with that work." (*Id.* ¶ 24.) Also as before, if "an asbestos-containing part was an original component of an item of machinery . . . [the Navy] replaced [the part] with the same type of part, as called out in the drawings, instruction books[,] and technical manuals prepared by the manufacturer," so long as the replacement part conformed to the Navy's specifications at the time of replacement. (Pl.'s SUMF ¶ 22; *see* Foster Wheeler Resp. Pl.'s SUMF ¶ 22; Foster Wheeler SUMF ¶¶ 25, 27.)

The Foster Wheeler boilers incorporated parts that contained asbestos, such as gaskets, sheets, and packing. (Pl.'s SUMF ¶ 18.) It was expected that gaskets must periodically be replaced. (*Id.* ¶ 74; Foster Wheeler Resp. Pl.'s SUMF ¶ 74.) Any original gaskets associated with the Foster Wheeler boilers would have been replaced by the time Mr. Hammell boarded the *Roan*. (Foster Wheeler SUMF ¶ 15.) In addition to the parts incorporated within the boilers, Foster Wheeler was aware that insulation must be installed with its boilers and that the common practice in the 1940s was to use asbestos insulation. (Pl.'s SUMF ¶ 73; Foster Wheeler Resp. Pl.'s SUMF ¶ 73.) There is no evidence that Foster Wheeler supplied or installed any asbestos insulation on the *Roan*.[3] (Foster Wheeler SUMF ¶ 17; Pl.'s Resp. Foster Wheeler SUMF ¶ 17.)

---

[3] Plaintiff asserts that "Foster Wheeler recommended the use of thermal insulation and gaskets on various parts of its marine boilers," (Pl.'s SUMF ¶ 21), and that "Foster Wheeler purchase[] orders demonstrate that Foster Wheeler [provided] asbestos-containing replacement parts for their boilers on [other Navy ships,]" (*id.* ¶ 23).

5

Asbestos-containing gaskets were "not necessitated" by the Foster Wheeler boilers nor "compelled by the lack of available alternatives"; asbestos-free gaskets were available at the time of the *Roan*'s construction. (Foster Wheeler SUMF ¶¶ 38–39.) Although there were alternatives to asbestos-containing gaskets for the Foster Wheeler boilers, the Navy opted to continue using asbestos-containing gaskets. (*Id.* ¶¶ 39–40.) There is no evidence Foster Wheeler supplied or installed any replacement asbestos-containing gaskets for the *Roan*'s boilers. (*Id.* ¶ 16; Pl.'s Resp. Foster Wheeler SUMF ¶ 16.)

Foster Wheeler also asserts there were numerous alternatives to asbestos insulation. (Foster Wheeler SUMF ¶¶ 29–37.) Plaintiff's expert, however, states there were no viable alternatives to asbestos insulation on the *Roan* because the light-weight asbestos insulation was essential for "weight-critical" destroyers like the *Roan*. (Pl.'s SUMF ¶ 77; Foster Wheeler SUMF ¶ 37.) The Navy's transition to using non-asbestos insulating materials began in the late 1960s and was not completed until October 1975. (Pl.'s SUMF ¶ 76; Westinghouse Resp. Pl.'s SUMF ¶ 76; Foster Wheeler Resp. Pl.'s SUMF ¶ 76.)

Mr. Hammell's duties on the *Roan* included regularly removing and replacing gaskets in the Foster Wheeler boilers. (Foster Wheeler SUMF ¶ 3; Pl.'s SUMF ¶ 39.) This work entailed removing and replacing asbestos pipe-covering. (Foster Wheeler SUMF ¶ 5.) As with the Westinghouse FDBs, replacing the gaskets in the Foster Wheeler boilers required using a wrench or "scrap[ing] the gaskets off with either a paint scraper or pen knife, followed by a wire brush, Brillo pad, or sandpaper." (Pl.'s SUMF ¶ 42; Foster Wheeler Resp. Pl.'s SUMF ¶ 42.) The gaskets were then cut with a knife, ball peen hammer, or shears. (Pl.'s SUMF ¶ 43.) The installation process could require Mr. Hammell to "beat around the edges of the gasket, which would score it and break it off." (*Id.* ¶ 44 (internal quotation marks omitted).) Mr. Hammell also "worked with

6

asbestos packing to seal the doors of the Foster Wheeler boilers," which involved cutting asbestos rope. (*Id.* ¶ 37–38.) This work created dust in the air. (*Id.* ¶ 61.)

### C. Knowledge of the Harms of Asbestos

By the 1930s "it was known among the medical community that asbestos could cause the deadly disease asbestosis," and that those "who breathed asbestos dust[] were at risk for asbestosis." (Pl.'s SUMF ¶ 80.) By the 1940s, "exposure to asbestos was associated with lung cancer" and "confirmed by many case studies" appearing in medical literature. (*Id.* ¶¶ 81–83.) By the 1960s, links between asbestos and mesothelioma were identified. (*Id.* ¶¶ 84–86.) In particular, Westinghouse knew in the early 1940s that asbestos was hazardous. (*Id.* ¶¶ 87–88, 90; Westinghouse Resp. Pl.'s SUMF ¶¶ 87–88, 90.)

The Navy knew of some hazards caused by asbestos as early as 1922, and by 1941 prescribed measures to prevent asbestos-related illnesses in some situations. (Westinghouse SUMF ¶ 18; Foster Wheeler SUMF ¶ 47.) The Navy, however, relying on a 1946 study of the risk of asbestosis in Navy shipyards, "believed for the next twenty years that asbestos exposure was not a problem during construction or repair of ships." (Pl.'s SUMF ¶ 91; Westinghouse Resp. Pl.'s SUMF ¶ 91; Foster Wheeler Resp. Pl.'s SUMF ¶ 91.) The Navy did not realize the danger from asbestos in shipyards until 1964, and that awareness was confined to the danger of asbestosis— not cancer. (Pl.'s SUMF ¶ 92; Westinghouse Resp. Pl.'s SUMF ¶ 92; Foster Wheeler Resp. Pl.'s SUMF ¶ 92.)

In the 1960s, it was the opinion of the Navy that "packings and gaskets containing asbestos are not considered to be a significant health hazard" because "these items do not cause dust in shipboard applications." (Westinghouse SUMF ¶ 33 (citing Riblett Memo., Keale Cert. Ex. K, ECF No. 346-14).) As late as 1978, the Navy concluded that "asbestos containing gaskets presented no health hazard in forms used in shipyard applications." (Westinghouse SUMF ¶ 34

(citing Forman Decl. ¶¶ 107–09, Keale Cert. Ex. E, ECF No. 346-8); Foster Wheeler SUMF ¶ 59.) The movants do not address specifically Westinghouse, Foster Wheeler, or the Navy's knowledge of the dangers of asbestos gaskets in applications outside the shipyard, such as when Mr. Hammell was aboard the *Roan* at sea.

## II.  LEGAL STANDARD

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact raises a "genuine" dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Borough of W. Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (quoting *Anderson*, 477 U.S. at 248).

"In evaluating the evidence, the Court must consider all facts and their logical inferences in the light most favorable to the non-moving party." *Rhodes v. Marix Servicing, LLC*, 302 F. Supp. 3d 656, 661 (D.N.J. 2018) (citing *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002)). "While the moving party bears the initial burden of proving an absence of a genuine dispute of material fact, meeting this obligation shifts the burden to the non-moving party to 'set forth specific facts showing that there is a genuine [dispute] for trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 250).

"Unsupported allegations, subjective beliefs, or argument alone . . . cannot forestall summary judgment." *Read v. Profeta*, 397 F. Supp. 3d 597, 625 (D.N.J. 2019). "Thus, if the nonmoving party fails 'to make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be no genuine issue of material fact . . . .'" *Id.* (quoting *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quotation marks omitted)). "In considering the motion, the Court 'does not resolve factual disputes or make credibility

determinations.'" *Rhodes*, 302 F. Supp. 3d at 661 (quoting *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995)).

## III.   DISCUSSION

Defendants both move for summary judgment on the basis that Plaintiff cannot establish that the manufacturers had a duty to warn for injuries caused by asbestos manufactured and furnished by third parties. (*See* Westinghouse Moving Br. 4–17, ECF No. 346-1; Foster Wheeler Moving Br. 5–21, ECF No. 347-1.) Foster Wheeler also seeks summary judgment on the basis that Plaintiff cannot establish that its failure to warn was the proximate cause of Mr. Hammell's injuries. (Foster Wheeler Moving Br. 21–27.) Finally, Westinghouse also argues it is entitled to summary judgment because the government contractor defense bars Plaintiff's claims. (Westinghouse Moving Br. 17–27.)

### A.   Westinghouse and Foster Wheeler's Duty to Warn

The parties agree the United States Supreme Court's recent decision in *Air & Liquid Systems Corp. v. DeVries*, 139 S. Ct. 986 (2019), provides the relevant test for Defendants' duty to warn. In the context of maritime torts, a product manufacturer has a duty to warn when: (1) "its product requires incorporation of a part [that makes the integrated product dangerous for its intended uses]"; (2) "the manufacturer knows or has reason to know that the integrated product is likely to be dangerous for its intended uses"; and (3) "the manufacturer has no reason to believe that the product's users will realize that danger." *DeVries*, 139 S. Ct. at 995. Specifically, for the first element, a product requires incorporation of a part when "the product in effect requires the part . . . to function as intended," such as when (1) "a manufacturer directs that the part be

9

incorporated,"[4] (2) "a manufacturer itself makes the product with a part that the manufacturer knows will require replacement with a similar part,"[5] or (3) "a product would be useless without the part."[6] *Id.* at 995–96.

The dissent in *DeVries* identified several uncertainties in the majority's test that are relevant to this matter: "[W]hen is incorporation of a dangerous third-party product 'required' as opposed to just optimal or preferred? What if a potential substitute existed, but it was less effective

---

[4] The Supreme Court cited *Bell v. Foster Wheeler Energy Corp.*, No. 15-6394, 2016 WL 5780104, at *6–7 (E.D. La. Oct. 4, 2016). The *Bell* court held that "a manufacturer of a finished product that incorporates asbestos components" is liable in both strict liability and negligence actions where "the harm is caused by an asbestos component added to the product by the manufacturer." *Bell*, 2016 WL 5780104, at * 6. Where "the harm is caused by an aftermarket asbestos component," the product manufacturer is not liable in a strict liability action, but "may still be liable under a negligence theory if a breach of the duty to warn regarding the original asbestos components that the manufacturer added to the product is a proximate cause of the subsequent harmful exposure to asbestos contained in an aftermarket replacement part." *Id.*

[5] The Supreme Court referenced cases in which a manufacturer of a product that contained asbestos was liable where the product contained asbestos, the asbestos was essential to the operation of the product, and the asbestos-containing part required periodic replacement. *See Quirin v. Lorillard Tobacco Co.*, 17 F. Supp. 3d 760, 769–70 (N.D. Ill. 2014) (finding "a duty may attach where the defendant manufactured a product that, by necessity, contained asbestos components, where the asbestos-containing material was essential to the proper functioning of the defendant's product, and where the asbestos-containing material would necessarily be replaced by other asbestos-containing material, whether supplied by the original manufacturer or someone else"); *see also Chesher v. 3M Co.*, 234 F. Supp. 3d 693, 713–14 (D.S.C. 2017) (adopting *Quirin* approach and holding "a plaintiff must show: (1) the defendant actually incorporated asbestos-containing components into its original product, and (2)(a) the defendant 'specified' the use of asbestos-containing components, *or* (b) such components were 'essential to the proper functioning' of the defendant's product" (quoting *Quirin*, 17 F. Supp. 3d at 769)); *May v. Air & Liquid Sys. Corp.*, 129 A.3d 984, 1000 (Md. 2015) (denying defendant's motion for summary judgment where it was "undisputed that the [product] contained asbestos, and there [wa]s sufficient evidence that the asbestos was essential to its operation, needed periodic replacement, and was dangerous").

[6] *See In re N.Y.C. Asbestos Litig.*, 59 N.E. 3d 458, 474 (N.Y. 2016) ("[T]he manufacturer of a product has a duty to warn of the danger arising from the known and reasonably foreseeable use of its product in combination with a third-party product which, as a matter of design, mechanics[,] or economic necessity, is necessary to enable the manufacturer's product to function as intended.").

or more costly (surely alternatives to asbestos insulation have existed for a long time)?" *Id.* at 998 (Gorsuch, J., dissenting). And as for the third element—that the manufacturer has no reason to believe the product's users will realize the danger: "[W]hat if the defendants . . . understood that the Navy itself would warn sailors about the need for proper handling of asbestos—did they still have to provide their own warnings?" *Id.* at 999 (Gorsuch, J., dissenting).

The Court finds that disputes of material fact preclude summary judgment for Defendants. First, the Court finds that there is a dispute of material fact over whether the Westinghouse FDBs and the Foster Wheeler boilers required incorporation of asbestos-containing gaskets. There is evidence in the record that Defendants' products incorporated asbestos-containing gaskets when furnished to the Navy. There is also evidence that Defendants' products required the periodic replacement of gaskets to function as intended. Plaintiff also references design drawings produced by Defendants that specify the incorporation of asbestos-containing parts—although Defendants dispute whether they, the Navy, or the Navy's architect originally specified incorporation of the parts. Finally, Defendants knew or should have known that the Navy would replace asbestos-containing gaskets with more asbestos-containing gaskets because Defendants knew asbestos-containing gaskets were permitted to be incorporated into their products and the Navy was likely to replace an asbestos-containing gasket with another so long as it was permitted.

Defendants assert that asbestos-containing gaskets were never *required* for their products, only that they were optimal or preferred by the Navy. *DeVries* provides little clarity on whether a part is required when there are possible, yet likely unrealistic, alternatives. The Supreme Court, however, endorsed finding that asbestos was required in situations where there might be alternatives but asbestos was an "economic necessity" for the product to function as intended. *See DeVries*, 139 S. Ct. at 996 (citing *In re N.Y.C. Asbestos Litig.*, 59 N.E. 3d at 474). The Supreme

Court also favorably cited situations where "the defendant actually incorporated asbestos-containing components into its original product[] and . . . 'specified' the use of asbestos-containing components. *Id.* (citing *Chesher*, 234 F. Supp. 3d at 713–14). In light of these situations, the Court finds that Plaintiff has produced sufficient evidence to create genuine disputes over whether Defendants specified that asbestos-containing parts be incorporated into their products, whether Defendants made their products with asbestos-containing parts knowing those parts would be replaced with similar parts, and whether Defendants' parts could function as intended aboard the *Roan* with gaskets that did not contain asbestos.

Second, the Court finds there is a dispute of material fact over whether Defendants knew or had reason to know their integrated products were likely to be dangerous for their intended uses. There is ample evidence that Defendants knew or should have known by the time their products were furnished to the Navy that exposure to asbestos dust could cause asbestosis or lung cancer. Defendants also knew their products, when used as intended, required periodic replacement of asbestos-containing gaskets. And there is evidence that Defendants knew or should have known that removing and replacing asbestos-containing gaskets could expose a user to asbestos dust.

Defendants argue it is not enough for them to know that asbestos is dangerous, but that Plaintiff must be able to show Defendants knew their integrated products—the FDBs or boilers—were dangerous. Here, this is a distinction without a difference. When a manufacturer knows (1) that asbestos dust is dangerous; (2) that an integrated product, used as intended, requires periodic replacement of an asbestos-containing part; and (3) that the replacement process will expose users to asbestos dust, the manufacturer has reason to know the integrated product is likely to be dangerous for its intended uses. Accordingly, there is a genuine dispute over the second element of the *DeVries* test.

Third, the Court finds there is a dispute of material fact over whether Defendants had no reason to believe the Navy or sailors would realize the danger of the integrated products. Defendants argue that the Navy was aware of the dangers of asbestos and had just as much information as they did about those dangers. Defendants, however, concede that the Navy believed asbestos-containing gaskets presented no health hazard in shipyard applications. (*See* Westinghouse SUMF ¶ 34; Foster Wheeler SUMF ¶ 59.) This alone is sufficient to create a genuine dispute of material fact because the Navy was not aware of the dangers of asbestos-containing gaskets in environments such as the shipyard where Mr. Hammell worked and Defendants had reason to know the Navy would not realize the dangers posed by their products when in shipyards.

Considering the undisputed material facts and their logical inferences in the light most favorable to Plaintiff, the Court finds that Defendants fail to establish as a matter of law that Plaintiff cannot succeed on her failure to warn claims.

**B.      Substantial Factor Causation**

Foster Wheeler also argues that Plaintiff cannot show that its failure to warn Mr. Hammell of the asbestos hazards was the proximate cause of his injuries because Plaintiff "explicitly acknowledged that he repeatedly ignored warnings and essentially engaged in conduct he knew could harm him," such as smoking. (Foster Wheeler Moving Br. 24.) The parties agree that under maritime law a defendant's negligence must be a substantial factor in bringing about the harm. (*Id.* at 23; Pl.'s Opp'n Foster Wheeler Br. 35, ECF No. 356.) Under that standard, "the plaintiff must show a high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural." *Grammer v. Advocate Mines, Ltd.*, MDL No. 875, No. 09-92425, 2011 WL 6026597, at 2 n.1 (E.D. Pa. Dec. 2, 2011) (internal quotation marks omitted) (quoting *Lindstrom v. A-C Prod. Liab. Trust*, 424 F.3d 488, 492 (6th Cir. 2005),

*abrogated on other grounds by DeVries*, 139 S. Ct. 986 (2019)). "The exposure must have been actual or real, but the question of substantiality is one of degree normally best left to the factfinder." *Id.* (citing *Redland Soccer Club, Inc. v. Dep't of Army of U.S.*, 55 F.3d 827, 851 (3d Cir. 1995)).

Considering the undisputed facts in the record documenting Mr. Hammell's exposure to asbestos on the *Roan*, as well as Mr. Hammell's testimony that "had [he] been informed about the hazards of asbestos while he served aboard the [*Roan*], [he] would have taken precautions to the best of his ability, (Pl.'s SUMF ¶ 171), the Court finds that Foster Wheeler fails to demonstrate as a matter of law that Plaintiff cannot establish proximate cause.

  **C. Government Contractor Defense**

Westinghouse argues Plaintiff's claims are barred by the government contractor defense because the Navy was aware of the hazards of asbestos and approved Westinghouse's FDBs. On a motion for summary judgment based on the government contractor defense, "a defendant must show that (1) the United States approved reasonably precise specifications for the product at issue; (2) the equipment conformed to those specifications; and (3) [the defendant] warned the United States about the dangers in the use of the equipment that were known to it but not to the United States." *Duenas v. Gen. Elec. Co.*, MDL No. 875, No. 12-60040, 2014 WL 345232, at 5 n.1 (E.D. Pa. Jan. 29, 2014) (citing *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988)). "As to the first and second prongs, in a failure to warn context, . . . the defendant must show that the government 'issued reasonably precise specifications covering warnings—specifications that reflect a considered judgment about the warnings at issue.'" *Id.* at 5 n.1 (quoting *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783 (E.D. Pa. 2010)). "[T]he third prong . . . may be established by showing that the government 'knew as much or more than the defendant contractor about the hazards' of the product." *Id.* at 6 n.1 (quoting *Willis v. BW IP Int'l, Inc.*, 811 F. Supp. 2d 1146 (E.D. Pa. 2011)) . "[A] defendant asserting the government contractor defense has the burden of

14

showing the absence of a genuine dispute as to any material fact regarding whether it is entitled to the . . . defense." *Id.* at 6 n.1.

Here, the Court finds there is a dispute of material fact over whether the government knew as much or more than Westinghouse about the hazards of the Westinghouse FDBs or asbestos.[7] As discussed regarding Westinghouse's duty to warn, Westinghouse concedes the Navy believed asbestos-containing gaskets presented no health hazard in shipyard applications. (*See* Westinghouse SUMF ¶¶ 33–34.) Considering Westinghouse's awareness that (1) the FDBs would require periodic replacement, (2) the replacement process could expose workers to asbestos, (3) asbestos was hazardous, and (4) the Navy determined asbestos-containing gaskets presented no health hazard in shipyard applications, there is a sufficient dispute of material fact over whether the Navy knew as much or more than Westinghouse about the hazards of asbestos or the FDBs. Westinghouse, accordingly, fails to demonstrate it is entitled to judgment as a matter of law on the basis of the government contractor defense.

## IV. CONCLUSION

The Court finds that Defendants are not entitled to judgment as a matter of law on Plaintiff's duty to warn claims based on *DeVries* because there are genuine disputes of material facts. The Court also finds genuine disputes of material facts preclude Foster Wheeler's argument that Plaintiff cannot establish substantial factor causation. Finally, the Court finds that there is a dispute of material fact that precludes Westinghouse from establishing the government contractor

---

[7] Because the Court finds a dispute of material fact on the third prong of the *Boyle* test and Westinghouse must succeed on all three prongs to be entitled to judgment as a matter of law, the Court does not discuss the first and second prongs.

15

defense. The Court, accordingly, denies Defendants' Motions for Summary Judgment. The Court will enter an Order consistent with this Memorandum Opinion.

/s/ Michael A. Shipp
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**